# NIXON *v.* FITZGERALD

No. 79–1738.   Argued November 30, 1981—Decided June 24, 1982

732

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and REHNQUIST, STEVENS, and O'CONNOR, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 758. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 764. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 797.

*Herbert J. Miller, Jr.*, argued the cause for petitioner. With him on the briefs was *R. Stan Mortenson.*

*John E. Nolan, Jr.*, argued the cause for respondent. With him on the brief were *Samuel T. Perkins* and *Arthur B. Spitzer.**

JUSTICE POWELL delivered the opinion of the Court.

The plaintiff in this lawsuit seeks relief in civil damages from a former President of the United States. The claim rests on actions allegedly taken in the former President's official capacity during his tenure in office. The issue before us is the scope of the immunity possessed by the President of the United States.

I

In January 1970 the respondent A. Ernest Fitzgerald lost his job as a management analyst with the Department of the Air Force. Fitzgerald's dismissal occurred in the context of a departmental reorganization and reduction in force, in

---

*\*Louis Alan Clark* filed a brief for the Government Accountability Project of the Institute for Policy Studies as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Solicitor General Lee* for the United States; by *Roger J. Marzulla* and *William H. Mellor III* for the Mountain States Legal Foundation; by *John C. Armor* and *H. Richard Mayberry* for the National Taxpayers Legal Fund, Inc.; and by *Thomas J. Madden* for Senator Orrin G. Hatch et al.

which his job was eliminated. In announcing the reorganization, the Air Force characterized the action as taken to promote economy and efficiency in the Armed Forces.

Respondent's discharge attracted unusual attention in Congress and in the press. Fitzgerald had attained national prominence approximately one year earlier, during the waning months of the Presidency of Lyndon B. Johnson. On November 13, 1968, Fitzgerald appeared before the Subcommittee on Economy in Government of the Joint Economic Committee of the United States Congress. To the evident embarrassment of his superiors in the Department of Defense, Fitzgerald testified that cost-overruns on the C–5A transport plane could approximate $2 billion.[1] He also revealed that unexpected technical difficulties had arisen during the development of the aircraft.

Concerned that Fitzgerald might have suffered retaliation for his congressional testimony, the Subcommittee on Economy in Government convened public hearings on Fitzgerald's dismissal.[2] The press reported those hearings prominently,

---

[1] See Economics of Military Procurement: Hearings before the Subcommittee on Economy in Government of the Joint Economic Committee, 90th Cong., 2d Sess., pt. I, pp. 199–201 (1968–1969). It is not disputed that officials in the Department of Defense were both embarrassed and angered by Fitzgerald's testimony. Within less than two months of respondent's congressional appearance, staff had prepared a memorandum for the outgoing Secretary of the Air Force, Harold Brown, listing three ways in which Fitzgerald might be removed from his position. See App. 209a–211a (memorandum of John Lang to Harold Brown, Jan. 6, 1969). Among these was a "reduction in force"—the means by which Fitzgerald ultimately was removed by Brown's successor in office under the new Nixon administration. The reduction in force was announced publicly on November 4, 1969, and Fitzgerald accordingly was separated from the Air Force upon the elimination of his job on January 5, 1970.

[2] See The Dismissal of A. Ernest Fitzgerald by the Department of Defense: Hearings before the Subcommittee on Economy in Government of the Joint Economic Committee, 91st Cong., 1st Sess. (1969). Some 60 Members of Congress also signed a letter to the President protesting the

as it had the earlier announcement that his job was being eliminated by the Department of Defense. At a news conference on December 8, 1969, President Richard Nixon was queried about Fitzgerald's impending separation from Government service.[3] The President responded by promising to look into the matter.[4] Shortly after the news conference the petitioner asked White House Chief of Staff H. R. Haldeman to arrange for Fitzgerald's assignment to another job within the administration.[5] It also appears that the President suggested to Budget Director Robert Mayo that Fitzgerald might be offered a position in the Bureau of the Budget.[6]

Fitzgerald's proposed reassignment encountered resistance within the administration.[7] In an internal memorandum of January 20, 1970, White House aide Alexander Butterfield reported to Haldeman that "'Fitzgerald is no doubt a top-notch cost expert, but he must be given very low

---

"firing of this dedicated public servant" as a "punitive action." *Id.*, at 115–116.

[3] A briefing memorandum on the Fitzgerald matter had been prepared by White House staff in anticipation of a possible inquiry at the forthcoming press conference. Authored by aide Patrick Buchanan, it advanced the view that the Air Force was "firing . . . a good public servant." App. 269a (memorandum of Patrick Buchanan to Richard Nixon, Dec. 5, 1969). The memorandum suggested that the President order Fitzgerald's retention by the Defense Department.

[4] *Id.*, at 228a.

[5] See *id.*, at 109a–112a (deposition of H. R. Haldeman); *id.*, at 137a–141a (deposition of petitioner Richard Nixon). Haldeman's deposed testimony was based on his handwritten notes of December 12, 1969. *Id.*, at 275a.

[6] See *id.*, at 126a (deposition of Robert Mayo); *id.*, at 141a (deposition of Richard Nixon).

[7] Both Mayo and his deputy, James Schlesinger, appear to have resisted at least partly due to a suspicion that Fitzgerald lacked institutional loyalty to executive policies and that he spoke too freely in communications with friends on Capitol Hill. Both also stated that high-level positions were presently unavailable within the Bureau of the Budget. See *id.*, at 126a (deposition of Robert Mayo); *id.*, at 146a–147a (deposition of James Schlesinger).

marks in loyalty; and after all, loyalty is the name of the game.'"[8]   Butterfield therefore recommended that "'[w]e should let him bleed, for a while at least.'"[9]   There is no evidence of White House efforts to reemploy Fitzgerald subsequent to the Butterfield memorandum.

Absent any offer of alternative federal employment, Fitzgerald complained to the Civil Service Commission.   In a letter of January 20, 1970, he alleged that his separation represented unlawful retaliation for his truthful testimony before a congressional Committee.[10]   The Commission convened a closed hearing on Fitzgerald's allegations on May 4, 1971. Fitzgerald, however, preferred to present his grievances in public.   After he had brought suit and won an injunction, *Fitzgerald* v. *Hampton*, 152 U. S. App. D. C. 1, 467 F. 2d 755 (1972), public hearings commenced on January 26, 1973. The hearings again generated publicity, much of it devoted to the testimony of Air Force Secretary Robert Seamans.   Although he denied that Fitzgerald had lost his position in retaliation for congressional testimony, Seamans testified that he had received "some advice" from the White House before

---

[8] Quoted in *Decision on the Appeal of A. Ernest Fitzgerald* (Sept. 18, 1973) *(CSC Decision)*, reprinted in App. 60a, 84a.   (Page citations to the *CSC Decision* refer to the cited page in the Joint Appendix.)

[9] *Id.*, at 85a.   The memorandum added that "'[w]e owe "first choice on Fitzgerald" to [Senator] Proxmire and others who tried so hard to make him a hero [for exposing the cost overruns].'"   Suspicion of Fitzgerald's assumed loyalty toward Senator Proxmire was widely shared in the White House and in the Defense Department.   According to the *CSC Decision, supra:*

"While Mr. Fitzgerald has denied that he was 'Senator Proxmier's *[sic]* boy in the Air Force', and he may honestly believe it, we find this statement difficult to accept.   It is evident that the top officials in the Air Force, without specifically saying so, considered him to be just that. . . . We also note that upon leaving the Air Force Mr. Fitzgerald was employed as a consultant by the Proxmire Committee and that Senator Proxmire appeared at the Commission hearing as a character witness for [Fitzgerald]." App. 83a.

[10] *Id.*, at 61a.

Fitzgerald's job was abolished.[11] But the Secretary declined to be more specific. He responded to several questions by invoking "executive privilege."[12]

At a news conference on January 31, 1973, the President was asked about Mr. Seamans' testimony. Mr. Nixon took the opportunity to assume personal responsibility for Fitzgerald's dismissal:

> "I was totally aware that Mr. Fitzgerald would be fired or discharged or asked to resign. I approved it and Mr. Seamans must have been talking to someone who had discussed the matter with me. No, this was not a case of some person down the line deciding he should go. It was a decision that was submitted to me. I made it and I stick by it."[13]

A day later, however, the White House press office issued a retraction of the President's statement. According to a press spokesman, the President had confused Fitzgerald with another former executive employee. On behalf of the President, the spokesman asserted that Mr. Nixon had not had "put before him the decision regarding Mr. Fitzgerald."[14]

After hearing over 4,000 pages of testimony, the Chief Examiner for the Civil Service Commission issued his decision

---

[11] See id., at 83a–84a.

[12] See ibid.

[13] Id., at 185a. A few hours after the press conference, Mr. Nixon repeated privately to Presidential aide Charles Colson that he had ordered Fitzgerald's firing. Id., at 214a–215a (recorded conversation of Jan. 31, 1973).

[14] Id., at 196a (transcription of statement of White House press secretary Ronald Ziegler, Feb. 1, 1973). In a conversation with aide John Ehrlichman, following his conversation with Charles Colson, see n. 13, supra, the President again had claimed responsibility for Fitzgerald's dismissal. When Ehrlichman corrected him on several details, however, the President concluded that he was "thinkin' of another case." Id., at 218a (recorded conversation of Jan. 31, 1973). See id., at 220a. It was after this conversation that the retraction was ordered.

in the Fitzgerald case on September 18, 1973. *Decision on the Appeal of A. Ernest Fitzgerald,* as reprinted in App. 60a. The Examiner held that Fitzgerald's dismissal had offended applicable civil service regulations. *Id.,* at 86a–87a.[15] The Examiner based this conclusion on a finding that the departmental reorganization in which Fitzgerald lost his job, though purportedly implemented as an economy measure, was in fact motivated by "reasons purely personal to" respondent. *Id.,* at 86a. As this was an impermissible basis for a reduction in force,[16] the Examiner recommended Fitzgerald's reappointment to his old position or to a job of comparable authority.[17]

---

[15] Fitzgerald's position in the Air Force was in the "excepted service" and therefore not covered by civil service rules and regulations for the competitive service. *Fitzgerald* v. *Hampton,* 152 U. S. App. D. C. 1, 4, 467 F. 2d 755, 758 (1972); see *CSC Decision,* App. 63a–64a. In *Hampton,* however, the court held that Fitzgerald's employment nonetheless was under "legislative protection," since he was a "preference eligible" veteran entitled to various statutory protections under the Veterans' Preference Act. See 152 U. S. App. D. C., at 4–14, 467 F. 2d, at 758–768. Among these were the benefits of the reduction-in-force procedures established by civil service regulation. See *id.,* at 4, 467 F. 2d, at 758.

[16] The Examiner found that Fitzgerald in fact was dismissed because of his superiors' dissatisfaction with his job performance. App. 86a–87a. Their attitude was evidenced by "statements that he was not a 'team player' and 'not on the Air Force team.'" *Id.,* at 83a. Without deciding whether this would have been an adequate basis for an "adverse action" against Fitzgerald as an "inadequate or unsatisfactory employee," *id.,* at 86a, the Examiner held that the Commission's adverse action procedures, current version codified at 5 CFR pt. 752 (1982), implicitly forbade the Air Force to employ a "reduction in force" as a means of dismissing respondent for reasons "personal to" him. App. 87a.

[17] The Commission also ordered that Fitzgerald should receive backpay. *Id.,* at 87a–88a. Following the Commission's order, respondent was offered a new position with the Defense Department, but not one that he regarded as equivalent to his former employment. Fitzgerald accordingly filed an enforcement action in the District Court. This litigation ultimately culminated in a settlement agreement. Under its terms the United States Air Force agreed to reassign Fitzgerald to his former position as Management Systems Deputy to the Assistant Secretary of the Air

The Examiner, however, explicitly distinguished this narrow conclusion from a suggested finding that Fitzgerald had suffered retaliation for his testimony to Congress. As found by the Commission, "the evidence of record does not support [Fitzgerald's] allegation that his position was abolished and that he was separated . . . in retaliation for his having revealed the C–5A cost overrun in testimony before the Proxmire Committee on November 13, 1968." *Id.*, at 81a.

Following the Commission's decision, Fitzgerald filed a suit for damages in the United States District Court. In it he raised essentially the same claims presented to the Civil Service Commission.[18] As defendants he named eight officials of the Defense Department, White House aide Alexander Butterfield, and "one or More" unnamed "White House Aides" styled only as "John Does."

The District Court dismissed the action under the District of Columbia's 3-year statute of limitations, *Fitzgerald* v. *Seamans*, 384 F. Supp. 688 (DC 1974), and the Court of Appeals affirmed as to all but one defendant, White House aide Alexander Butterfield, *Fitzgerald* v. *Seamans*, 180 U. S. App. D. C. 75, 553 F. 2d 220 (1977). The Court of Appeals reasoned that Fitzgerald had no reason to suspect White House involvement in his dismissal at least until 1973. In that year, reasonable grounds for suspicion had arisen, most notably through publication of the internal White House memorandum in which Butterfield had recommended that Fitzgerald at least should be made to "bleed for a while" before being offered another job in the administration. *Id.*, at 80, 84, 553 F. 2d, at 225, 229. Holding that concealment of illegal activ-

---

Force, effective June 21, 1982. See Settlement Agreement in *Fitzgerald* v. *Hampton et al.*, Civ. No. 76–1486 (DC June 15, 1982).

[18] The complaint alleged a continuing conspiracy to deprive him of his job, to deny him reemployment, and to besmirch his reputation. Fitzgerald alleged that the conspiracy had continued through the Commission hearings and remained in existence at the initiation of the lawsuit. See *Fitzgerald* v. *Seamans*, 384 F. Supp. 688, 690–692 (DC 1974).

ity would toll the statute of limitations, the Court of Appeals remanded the action against Butterfield for further proceedings in the District Court.

Following the remand and extensive discovery thereafter, Fitzgerald filed a second amended complaint in the District Court on July 5, 1978. It was in this amended complaint—more than eight years after he had complained of his discharge to the Civil Service Commission—that Fitzgerald first named the petitioner Nixon as a party defendant.[19] Also included as defendants were White House aide Bryce Harlow and other officials of the Nixon administration. Additional discovery ensued. By March 1980, only three defendants remained: the petitioner Richard Nixon and White House aides Harlow and Butterfield. Denying a motion for summary judgment, the District Court ruled that the action must proceed to trial. Its order of March 26 held that Fitzgerald had stated triable causes of action under two federal statutes and the First Amendment to the Constitution.[20] The court also

---

[19] The general allegations of the complaint remained essentially unchanged. In averring Nixon's participation in the alleged conspiracy against him, the complaint quoted petitioner's press conference statement that he was "totally aware" of and in fact "approved" Fitzgerald's dismissal. Second Amended Complaint in *Fitzgerald* v. *Butterfield*, Civ. No. 74–78 (DC), p. 6.

[20] See App. to Pet. for Cert. 1a–2a. The District Court held that respondent was entitled to "infer" a cause of action under 5 U. S. C. § 7211 (1976 ed., Supp. IV) and 18 U. S. C. § 1505. Neither expressly confers a private right to sue for relief in damages. The first, 5 U. S. C. § 7211 (1976 ed., Supp. IV), provides generally that "[t]he right of employees . . . to . . . furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied." The second, 18 U. S. C. § 1505, is a criminal statute making it a crime to obstruct congressional testimony. The correctness of the decision that a cause of action could be "implied" under these statutes is not currently before us. As explained *infra*, this case is here under the "collateral order" doctrine, for review of the District Court's denial of petitioner's motion to dismiss on the ground that he enjoyed absolute immunity from civil suit. The District Court also held that respondent had stated a claim under the common law

ruled that petitioner was not entitled to claim absolute Presidential immunity.

Petitioner took a collateral appeal of the immunity decision to the Court of Appeals for the District of Columbia Circuit. The Court of Appeals dismissed summarily. It apparently did so on the ground that its recent decision in *Halperin* v. *Kissinger*, 196 U. S. App. D. C. 285, 606 F. 2d 1192 (1979), aff'd in pertinent part by an equally divided Court, 452 U. S. 713 (1981), had rejected this claimed immunity defense.

As this Court has not ruled on the scope of immunity available to a President of the United States, we granted certiorari to decide this important issue. 452 U. S. 959 (1981).

## II

Before addressing the merits of this case, we must consider two challenges to our jurisdiction. In his opposition to the petition for certiorari, respondent argued that this Court is without jurisdiction to review the nonfinal order in which the District Court rejected petitioner's claim to absolute immunity.[21] We also must consider an argument that an agreement between the parties has mooted the controversy.

## A

Petitioner invokes the jurisdiction of this Court under 28 U. S. C. § 1254, a statute that invests us with authority to review "[c]ases in" the courts of appeals.[22] When the peti-

---

of the District of Columbia, but respondent subsequently abandoned his common-law cause of action. See Supplemental Brief in Opposition 2.

[21] See Brief in Opposition 2. Although Fitzgerald has not continued to urge this argument, the challenge was jurisdictional, and we therefore address it.

[22] The statute provides in pertinent part:

"Cases in the courts of appeals may be reviewed by the Supreme Court by the following methods:

"(1) By writ of certiorari granted upon the petition of any party to any civil or criminal case, before or after rendition of judgment or decree . . . ."

tioner in this case sought review of an interlocutory order denying his claim to absolute immunity, the Court of Appeals dismissed the appeal for lack of jurisdiction. Emphasizing the "jurisdictional" basis for the Court of Appeals' decision, respondent argued that the District Court's order was not an appealable "case" properly "in" the Court of Appeals within the meaning of § 1254. We do not agree.

Under the "collateral order" doctrine of *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541 (1949), a small class of interlocutory orders are immediately appealable to the courts of appeals. As defined by *Cohen*, this class embraces orders that "conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and [are] effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 468 (1978); see *Cohen, supra*, at 546–547. As an additional requirement, *Cohen* established that a collateral appeal of an interlocutory order must "presen[t] a serious and unsettled question." 337 U. S., at 547. At least twice before this Court has held that orders denying claims of absolute immunity are appealable under the *Cohen* criteria. See *Helstoski* v. *Meanor*, 442 U. S. 500 (1979) (claim of immunity under the Speech and Debate Clause); *Abney* v. *United States*, 431 U. S. 651 (1977) (claim of immunity under Double Jeopardy Clause). In previous cases the Court of Appeals for the District of Columbia Circuit also has treated orders denying absolute immunity as appealable under *Cohen*. See *Briggs* v. *Goodwin*, 186 U. S. App. D. C. 179, 227–229, 569 F. 2d 10, 58–60 (1977) (Wilkey, J., dissenting on the appealability issue); *McSurely* v. *McClellan*, 172 U. S. App. D. C. 364, 372, 521 F. 2d 1024, 1032 (1975), aff'd in pertinent part en banc, 180 U. S. App. D. C. 101, 107–108, n. 18, 553 F. 2d 1277, 1283–1284, n. 18 (1976), cert. dism'd *sub nom. McAdams* v. *McSurely*, 438 U. S. 189 (1978).

In "dismissing" the appeal in this case, the Court of Appeals appears to have reasoned that petitioner's appeal lay

outside the *Cohen* doctrine because it raised no "serious and unsettled question" of law. This argument was pressed by the respondent, who asked the Court of Appeals to dismiss on the basis of that court's "controlling" decision in *Halperin* v. *Kissinger, supra.*

Under the circumstances of this case, we cannot agree that petitioner's interlocutory appeal failed to raise a "serious and unsettled" question. Although the Court of Appeals had ruled in *Halperin* v. *Kissinger* that the President was not entitled to absolute immunity, this Court never had so held. And a petition for certiorari in *Halperin* was pending in this Court at the time petitioner's appeal was dismissed. In light of the special solicitude due to claims alleging a threatened breach of essential Presidential prerogatives under the separation of powers, see *United States* v. *Nixon*, 418 U. S. 683, 691–692 (1974), we conclude that petitioner did present a "serious and unsettled" and therefore appealable question to the Court of Appeals. It follows that the case was "in" the Court of Appeals under § 1254 and properly within our certiorari jurisdiction.[23]

## B

Shortly after petitioner had filed his petition for certiorari in this Court and respondent had entered his opposition, the parties reached an agreement to liquidate damages.[24] Under

---

[23] There can be no serious doubt concerning our power to review a court of appeals' decision to dismiss for lack of jurisdiction—a power we have exercised routinely. See, *e. g.*, *Gardner* v. *Westinghouse Broadcasting Co.*, 437 U. S. 478 (1978). If we lacked authority to do so, decisions to dismiss for want of jurisdiction would be insulated entirely from review by this Court.

Nor, now that we have taken jurisdiction of the case, need we remand to the Court of Appeals for a decision on the merits. The immunity question is a pure issue of law, appropriate for our immediate resolution. Especially in light of the Court of Appeals' now-binding decision of the issue presented, concerns of judicial economy fully warrant our decision of the important question presented.

[24] Respondent filed a copy of this agreement with the Clerk of this Court on August 24, 1981, as an appendix to his brief in opposition to a motion of

its terms the petitioner Nixon paid the respondent Fitzgerald a sum of $142,000. In consideration, Fitzgerald agreed to accept liquidated damages of $28,000 in the event of a ruling by this Court that petitioner was not entitled to absolute immunity. In case of a decision upholding petitioner's immunity claim, no further payments would be made.

The limited agreement between the parties left both petitioner and respondent with a considerable financial stake in the resolution of the question presented in this Court. As we recently concluded in a case involving a similar contract: "Given respondents' continued active pursuit of monetary relief, this case remains 'definite and concrete, touching the legal relations of parties having adverse legal interests.'" *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363, 371 (1982), quoting *Aetna Life Ins. Co.* v. *Haworth*, 300 U. S. 227, 240–241 (1937).

### III

### A

This Court consistently has recognized that government officials are entitled to some form of immunity from suits for civil damages. In *Spalding* v. *Vilas*, 161 U. S. 483 (1896), the Court considered the immunity available to the Postmaster General in a suit for damages based upon his official acts. Drawing upon principles of immunity developed in English cases at common law, the Court concluded that "[t]he interests of the people" required a grant of absolute immunity to public officers. *Id.*, at 498. In the absence of immunity, the Court reasoned, executive officials would hesitate to exercise

Morton, Ina, David, Mark, and Gary Halperin to intervene and for other relief. On June 10, 1980, prior to the Court's action on the petition for certiorari, counsel to the parties had advised the Court that their clients had reached an agreement to liquidate damages, but that there remained a live controversy. Counsel did not include a copy of the agreement in their initial submission.

their discretion in a way "injuriously affect[ing] the claims of particular individuals," *id.*, at 499, even when the public interest required bold and unhesitating action. Considerations of "public policy and convenience" therefore compelled a judicial recognition of immunity from suits arising from official acts.

> "In exercising the functions of his office, the head of an Executive Department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint." *Id.*, at 498.

Decisions subsequent to *Spalding* have extended the defense of immunity to actions besides those at common law. In *Tenney* v. *Brandhove*, 341 U. S. 367 (1951), the Court considered whether the passage of 42 U. S. C. § 1983, which made no express provision for immunity for any official, had abrogated the privilege accorded to state legislators at common law. *Tenney* held that it had not. Examining § 1983 in light of the "presuppositions of our political history" and our heritage of legislative freedom, the Court found it incredible "that Congress . . . would impinge on a tradition so well grounded in history and reason" without some indication of intent more explicit than the general language of the statute. *Id.*, at 376. Similarly, the decision in *Pierson* v. *Ray*, 386 U. S. 547 (1967), involving a § 1983 suit against a state judge, recognized the continued validity of the absolute immunity of judges for acts within the judicial role. This was a doctrine "'not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions

with independence and without fear of consequences.'" *Id.*, at 554, quoting *Scott* v. *Stansfield*, L. R. 3 Ex. 220, 223 (1868). See *Bradley* v. *Fisher*, 13 Wall. 335 (1872). The Court in *Pierson* also held that police officers are entitled to a qualified immunity protecting them from suit when their official acts are performed in "good faith." 386 U. S., at 557.

In *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974), the Court considered the immunity available to state executive officials in a § 1983 suit alleging the violation of constitutional rights. In that case we rejected the officials' claim to absolute immunity under the doctrine of *Spalding* v. *Vilas*, finding instead that state executive officials possessed a "good faith" immunity from § 1983 suits alleging constitutional violations. Balancing the purposes of § 1983 against the imperatives of public policy, the Court held that "in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based." 416 U. S., at 247.

As construed by subsequent cases, *Scheuer* established a two-tiered division of immunity defenses in § 1983 suits. To most executive officers *Scheuer* accorded qualified immunity. For them the scope of the defense varied in proportion to the nature of their official functions and the range of decisions that conceivably might be taken in "good faith." This "functional" approach also defined a second tier, however, at which the especially sensitive duties of certain officials—notably judges and prosecutors—required the continued recognition of absolute immunity. See, *e. g.*, *Imbler* v. *Pachtman*, 424 U. S. 409 (1976) (state prosecutors possess absolute immunity with respect to the initiation and pursuit of prosecutions); *Stump* v. *Sparkman*, 435 U. S. 349 (1978) (state judge possesses absolute immunity for all judicial acts).

This approach was reviewed in detail in *Butz* v. *Econo-*

*mou*, 438 U. S. 478 (1978), when we considered for the first time the kind of immunity possessed by *federal* executive officials who are sued for constitutional violations.[25]   In *Butz* the Court rejected an argument, based on decisions involving federal officials charged with common-law torts, that all high federal officials have a right to absolute immunity from constitutional damages actions.   Concluding that a blanket recognition of absolute immunity would be anomalous in light of the qualified immunity standard applied to state executive officials, *id.*, at 504, we held that federal officials generally have the same qualified immunity possessed by state officials in cases under § 1983.   In so doing we reaffirmed our holdings that some officials, notably judges and prosecutors, "because of the special nature of their responsibilities," *id.*, at 511, "require a full exemption from liability." *Id.*, at 508. In *Butz* itself we upheld a claim of absolute immunity for administrative officials engaged in functions analogous to those of judges and prosecutors. *Ibid.*   We also left open the question whether other federal officials could show that "public policy requires an exemption of that scope." *Id.*, at 506.

## B

Our decisions concerning the immunity of government officials from civil damages liability have been guided by the Constitution, federal statutes, and history.   Additionally, at least in the absence of explicit constitutional or congressional guidance, our immunity decisions have been informed by the common law.   See *Butz* v. *Economou, supra*, at 508; *Imbler* v. *Pachtman, supra*, at 421.   This Court necessarily also has weighed concerns of public policy, especially as illuminated

---

[25] *Spalding* v. *Vilas*, 161 U. S. 483 (1896), was distinguished on the ground that the suit against the Postmaster General had asserted a common-law—and not a constitutional—cause of action.   See *Butz* v. *Economou*, 438 U. S., at 493–495.

by our history and the structure of our government. See, e. g., *Butz* v. *Economou*, *supra*, at 508; *Imbler* v. *Pachtman*, *supra*, at 421; *Spalding* v. *Vilas*, 161 U. S., at 498.[26]

This case now presents the claim that the President of the United States is shielded by absolute immunity from civil damages liability. In the case of the President the inquiries into history and policy, though mandated independently by our cases, tend to converge. Because the Presidency did not exist through most of the development of common law, any historical analysis must draw its evidence primarily from our constitutional heritage and structure. Historical inquiry thus merges almost at its inception with the kind of "public policy" analysis appropriately undertaken by a federal court. This inquiry involves policies and principles that may be considered implicit in the nature of the President's office in a system structured to achieve effective government under a constitutionally mandated separation of powers.

## IV

Here a former President asserts his immunity from civil damages claims of two kinds. He stands named as a defendant in a direct action under the Constitution and in two statutory actions under federal laws of general applicability. In neither case has Congress taken express legislative action to subject the President to civil liability for his official acts.[27]

---

[26] Although the Court in *Butz* v. *Economou*, *supra*, at 508, described the requisite inquiry as one of "public policy," the focus of inquiry more accurately may be viewed in terms of the "inherent" or "structural" assumptions of our scheme of government.

[27] In the present case we therefore are presented only with "implied" causes of action, and we need not address directly the immunity question as it would arise if Congress expressly had created a damages action against the President of the United States. This approach accords with this Court's settled policy of avoiding unnecessary decision of constitutional issues. Reviewing this case under the "collateral order" doctrine, see *supra*, at 742, we assume for purposes of this opinion that private causes of action may be inferred both under the First Amendment and the two statutes on which respondent relies. But it does not follow that we

Applying the principles of our cases to claims of this kind, we hold that petitioner, as a former President of the United States, is entitled to absolute immunity from damages liability predicated on his official acts. We consider this immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history. Justice Story's analysis remains persuasive:

> "There are . . . incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions, which are confided to it. Among these, must necessarily be included the power to perform them . . . . The president cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; and for this purpose his person must be deemed, in civil cases at least, to possess an official inviolability." 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418–419 (1st ed. 1833).

## A

The President occupies a unique position in the constitutional scheme. Article II, § 1, of the Constitution provides that "[t]he executive Power shall be vested in a President of

---

must—in considering a *Bivens* (*Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971)) remedy or interpreting a statute *in light of the immunity doctrine*—assume that the cause of action runs against the President of the United States. Cf. *Tenney* v. *Brandhove*, 341 U. S. 367, 376 (1951) (construing § 1983 in light of the immunity doctrine, the Court could not accept "that Congress . . . would impinge on a tradition [of legislative immunity] so well grounded in history and reason by covert inclusion in the general language before us," and therefore would not address issues that would arise if Congress had undertaken to deprive state legislators of absolute immunity). Consequently, our holding today need only be that the President is absolutely immune from civil damages liability for his official acts in the absence of explicit affirmative action by Congress. We decide only this constitutional issue, which is necessary to disposition of the case before us.

the United States . . . ." This grant of authority establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity. These include the enforcement of federal law—it is the President who is charged constitutionally to "take Care that the Laws be faithfully executed";[28] the conduct of foreign affairs—a realm in which the Court has recognized that "[i]t would be intolerable that courts, without the relevant information, should review and perhaps nullify actions of the Executive taken on information properly held secret";[29] and management of the Executive Branch—a task for which "imperative reasons requir[e] an unrestricted power [in the President] to remove the most important of his subordinates in their most important duties."[30]

In arguing that the President is entitled only to qualified immunity, the respondent relies on cases in which we have recognized immunity of this scope for governors and cabinet officers. *E. g., Butz* v. *Economou*, 438 U. S. 478 (1978); *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974). We find these cases to be inapposite. The President's unique status under the Constitution distinguishes him from other executive officials.[31]

---

[28] U. S. Const., Art. II, § 3.

[29] *Chicago & Southern Air Lines, Inc.* v. *Waterman S.S. Corp.*, 333 U. S. 103, 111 (1948).

[30] *Myers* v. *United States*, 272 U. S. 52, 134–135 (1926).

[31] Noting that the Speech and Debate Clause provides a textual basis for congressional immunity, respondent argues that the Framers must be assumed to have rejected any similar grant of executive immunity. This argument is unpersuasive. First, a specific textual basis has not been considered a prerequisite to the recognition of immunity. No provision expressly confers judicial immunity. Yet the immunity of judges is well settled. See, *e. g., Bradley* v. *Fisher*, 13 Wall. 335 (1872); *Stump* v. *Sparkman*, 435 U. S. 349 (1978). Second, this Court already has established that absolute immunity may be extended to certain officials of the Executive Branch. *Butz* v. *Economou*, 438 U. S., at 511–512; see *Imbler* v. *Pachtman*, 424 U. S. 409 (1976) (extending immunity to prosecutorial

Because of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government.   As is the case with prosecutors and judges—

officials within the Executive Branch).   Third, there is historical evidence from which it may be inferred that the Framers assumed the President's immunity from damages liability.   At the Constitutional Convention several delegates expressed concern that subjecting the President even to impeachment would impair his capacity to perform his duties of office.   See 2 M. Farrand, Records of the Federal Convention of 1787, p. 64 (1911) (remarks of Gouverneur Morris); *id.*, at 66 (remarks of Charles Pinckney). The delegates of course did agree to an Impeachment Clause.   But nothing in their debates suggests an expectation that the President would be subjected to the distraction of suits by disappointed private citizens.   And Senator Maclay has recorded the views of Senator Ellsworth and Vice President John Adams—both delegates to the Convention—that "the President, personally, was not the subject to any process whatever . . . .   For [that] would . . . put it in the power of a common justice to exercise any authority over him and stop the whole machine of Government."   Journal of William Maclay 167 (E. Maclay ed. 1890).   Justice Story, writing in 1833, held it implicit in the separation of powers that the President must be permitted to discharge his duties undistracted by private lawsuits.   3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418–419 (1st ed. 1833) (quoted *supra*, at 749).   Thomas Jefferson also argued that the President was not intended to be subject to judicial process.   When Chief Justice Marshall held in *United States* v. *Burr*, 25 F. Cas. 30 (No. 14,692d) (CC Va. 1807), that a subpoena *duces tecum* can be issued to a President, Jefferson protested strongly, and stated his broader view of the proper relationship between the Judiciary and the President: "The leading principle of our Constitution is the independence of the Legislature, executive and judiciary of each other, and none are more jealous of this than the judiciary.   But would the executive be independent of the judiciary, if he were subject to the *commands* of the latter, & to imprisonment for disobedience; if the several courts could bandy him from pillar to post, keep him constantly trudging from north to south & east to west, and withdraw him entirely from his constitutional duties?   The intention of the Constitution, that each branch should be independent of the others, is further manifested by the means it has furnished to each, to protect itself from enterprises of force attempted on them by the others, and to none has it given more effectual or diversified means than to the executive."   10 The Works of Thomas Jefferson 404 n. (P. Ford ed. 1905) (quoting a letter

for whom absolute immunity now is established—a President must concern himself with matters likely to "arouse the most intense feelings." *Pierson* v. *Ray*, 386 U. S., at 554. Yet, as our decisions have recognized, it is in precisely such cases that there exists the greatest public interest in providing an official "the maximum ability to deal fearlessly and impartially with" the duties of his office. *Ferri* v. *Ackerman*, 444 U. S. 193, 203 (1979). This concern is compelling where the officeholder must make the most sensitive and far-reaching decisions entrusted to any official under our constitutional system.[32] Nor can the sheer prominence of the President's

---

from President Jefferson to a prosecutor at the Burr trial) (emphasis in the original).

See also 5 D. Malone, Jefferson and His Time: Jefferson the President 320–325 (1974).

In light of the fragmentary character of the most important materials reflecting the Framers' intent, we do think that the most compelling arguments arise from the Constitution's separation of powers and the Judiciary's historic understanding of that doctrine. See text *supra*. But our primary reliance on constitutional structure and judicial precedent should not be misunderstood. The best historical evidence clearly supports the Presidential immunity we have upheld. JUSTICE WHITE's dissent cites some other materials, including ambiguous comments made at state ratifying conventions and the remarks of a single publicist. But historical evidence must be weighed as well as cited. When the weight of evidence is considered, we think we must place our reliance on the contemporary understanding of John Adams, Thomas Jefferson, and Oliver Ellsworth. Other powerful support derives from the actual history of private lawsuits against the President. Prior to the litigation explosion commencing with this Court's 1971 *Bivens* decision, fewer than a handful of damages actions ever were filed against the President. None appears to have proceeded to judgment on the merits.

[32] Among the most persuasive reasons supporting official immunity is the prospect that damages liability may render an official unduly cautious in the discharge of his official duties. As Judge Learned Hand wrote in *Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (CA2 1949), cert. denied, 339 U. S. 949 (1950), "[t]he justification for . . . [denying recovery] is that it is impossible to know whether the claim is well founded until the case has been tried, and to submit all officials, the innocent as well as the guilty, to the

office be ignored. In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for suits for civil damages.[33] Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve.

## B

Courts traditionally have recognized the President's constitutional responsibilities and status as factors counseling judicial deference and restraint.[34] For example, while courts generally have looked to the common law to determine the scope of an official's evidentiary privilege,[35] we have recognized that the Presidential privilege is "rooted in the separation of powers under the Constitution." *United States* v. *Nixon,* 418 U. S., at 708. It is settled law that the separation-of-powers doctrine does not bar every exercise of juris-

---

burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute . . . ."

[33] These dangers are significant even though there is no historical record of numerous suits against the President, since a right to sue federal officials for damages for constitutional violations was not even recognized until *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971).

[34] This tradition can be traced far back into our constitutional history. See, *e. g., Mississippi* v. *Johnson,* 4 Wall. 475, 501 (1866) ("[W]e are fully satisfied that this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties; and that no such bill ought to be received by us"); *Kendall* v. *United States,* 12 Pet. 524, 610 (1838) ("The executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power").

[35] See *United States* v. *Reynolds,* 345 U. S. 1, 6–7 (1953) (Secretary of the Air Force); *Carl Zeiss Stiftung* v. *V. E. B. Carl Zeiss, Jena,* 40 F. R. D. 318, 323–324 (DC 1966), aff'd *sub nom. V. E. B. Carl Zeiss, Jena* v. *Clark,* 128 U. S. App. D. C. 10, 384 F. 2d 979, cert. denied, 389 U. S. 952 (1967) (Department of Justice officials).

diction over the President of the United States. See, *e. g.*, *United States* v. *Nixon, supra; United States* v. *Burr*, 25 F. Cas. 187, 191, 196 (No. 14,694) (CC Va. 1807); cf. *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952).[36] But our cases also have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch. See *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 443 (1977); *United States* v. *Nixon, supra,* at 703–713. When judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance, cf. *Youngstown Sheet & Tube Co.* v. *Sawyer, supra,* or to vindicate the public interest in an ongoing criminal prosecution, see *United States* v. *Nixon, supra*—the exercise of jurisdiction has been held warranted. In the case of this merely private suit for damages based on a President's official acts, we hold it is not.[37]

---

[36] Although the President was not a party, the Court enjoined the Secretary of Commerce from executing a direct Presidential order. See 343 U. S., at 583.

[37] The Court has recognized before that there is a lesser public interest in actions for civil damages than, for example, in criminal prosecutions. See *United States* v. *Gillock*, 445 U. S. 360, 371–373 (1980); cf. *United States* v. *Nixon*, 418 U. S., at 711–712, and n. 19 (basing holding on special importance of evidence in a criminal trial and distinguishing civil actions as raising different questions not presented for decision). It never has been denied that absolute immunity may impose a regrettable cost on individuals whose rights have been violated. But, contrary to the suggestion of JUSTICE WHITE's dissent, it is not true that our jurisprudence ordinarily supplies a remedy in civil damages for every legal wrong. The dissent's objections on this ground would weigh equally against absolute immunity for any official. Yet the dissent makes no attack on the absolute immunity recognized for judges and prosecutors.

Our implied-rights-of-action cases identify another area of the law in which there is not a damages remedy for every legal wrong. These cases establish that victims of statutory crimes ordinarily may not sue in federal

## C

In defining the scope of an official's absolute privilege, this Court has recognized that the sphere of protected action must be related closely to the immunity's justifying purposes. Frequently our decisions have held that an official's absolute immunity should extend only to acts in performance of particular functions of his office. See *Butz* v. *Economou*, 438 U. S., at 508–517; cf. *Imbler* v. *Pachtman*, 424 U. S., at 430–431. But the Court also has refused to draw functional lines finer than history and reason would support. See, *e. g.*, *Spalding* v. *Vilas*, 161 U. S., at 498 (privilege extends to all matters "committed by law to [an official's] control or supervision"); *Barr* v. *Matteo*, 360 U. S. 564, 575 (1959) (fact "that the action here taken was within the outer perimeter of petitioner's line of duty is enough to render the privilege ap-

court in the absence of expressed congressional intent to provide a damages remedy. See, *e. g.*, *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353 (1982); *Middlesex County Sewerage Auth.* v. *National Sea Clammers Assn.*, 453 U. S. 1 (1981); *California* v. *Sierra Club*, 451 U. S. 287 (1981). JUSTICE WHITE does not refer to the jurisprudence of implied rights of action. Moreover, the dissent undertakes no discussion of cases in the *Bivens* line in which this Court has suggested that there would be no damages relief in circumstances "counseling hesitation" by the judiciary. See *Bivens* v. *Six Unknown Fed. Narcotics Agents, supra*, at 396; *Carlson* v. *Green*, 446 U. S. 14, 19 (1980) (in direct constitutional actions against officials with "independent status in our constitutional scheme . . . judicially created remedies . . . might be inappropriate").

Even the case on which JUSTICE WHITE places principal reliance, *Marbury* v. *Madison*, 1 Cranch 137 (1803), provides dubious support at best. The dissent cites *Marbury* for the proposition that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Id.*, at 163. Yet *Marbury* does not establish that the individual's protection must come in the form of a particular remedy. Marbury, it should be remembered, *lost* his case in the Supreme Court. The Court turned him away with the suggestion that he should have gone elsewhere with his claim. In this case it was clear at least that Fitzgerald was entitled to seek a remedy before the Civil Service Commission—a remedy of which he availed himself. See *supra*, at 736–739, and n. 17.

plicable . . ."); *Stump* v. *Sparkman*, 435 U. S., at 363, and n. 12 (judicial privilege applies even to acts occurring outside "the normal attributes of a judicial proceeding"). In view of the special nature of the President's constitutional office and functions, we think it appropriate to recognize absolute Presidential immunity from damages liability for acts within the "outer perimeter" of his official responsibility.

Under the Constitution and laws of the United States the President has discretionary responsibilities in a broad variety of areas, many of them highly sensitive. In many cases it would be difficult to determine which of the President's innumerable "functions" encompassed a particular action. In this case, for example, respondent argues that he was dismissed in retaliation for his testimony to Congress—a violation of 5 U. S. C. § 7211 (1976 ed., Supp. IV) and 18 U. S. C. § 1505. The Air Force, however, has claimed that the underlying reorganization was undertaken to promote efficiency. Assuming that petitioner Nixon ordered the reorganization in which respondent lost his job, an inquiry into the President's motives could not be avoided under the kind of "functional" theory asserted both by respondent and the dissent. Inquiries of this kind could be highly intrusive.

Here respondent argues that petitioner Nixon would have acted outside the outer perimeter of his duties by ordering the discharge of an employee who was lawfully entitled to retain his job in the absence of " 'such cause as will promote the efficiency of the service.' " Brief for Respondent 39, citing 5 U. S. C. § 7512(a). Because Congress has granted this legislative protection, respondent argues, no federal official could, within the outer perimeter of his duties of office, cause Fitzgerald to be dismissed without satisfying this standard in prescribed statutory proceedings.

This construction would subject the President to trial on virtually every allegation that an action was unlawful, or was taken for a forbidden purpose. Adoption of this construction thus would deprive absolute immunity of its intended effect.

It clearly is within the President's constitutional and statutory authority to prescribe the manner in which the Secretary will conduct the business of the Air Force. See 10 U. S. C. § 8012(b). Because this mandate of office must include the authority to prescribe reorganizations and reductions in force, we conclude that petitioner's alleged wrongful acts lay well within the outer perimeter of his authority.

## V

A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive.[38] There remains the constitutional remedy of impeachment.[39] In addition, there are formal and informal checks on Presidential action that do not apply with equal force to other executive officials. The President is subjected to constant scrutiny by the press. Vigilant oversight by Congress also may serve to deter Presidential abuses of office, as well as to make credible the threat of impeachment.[40] Other incentives to avoid misconduct may include a desire to earn reelection, the need to maintain prestige as an element of Presidential influence, and a President's traditional concern for his historical stature.

---

[38] The presence of alternative remedies has played an important role in our previous decisions in the area of official immunity. *E. g., Imbler* v. *Pachtman,* 424 U. S., at 428–429 ("We emphasize that the immunity of prosecutors from liability in suits under § 1983 does not leave the public powerless to deter misconduct or to punish that which occurs").

[39] The same remedy plays a central role with respect to the misconduct of federal judges, who also possess absolute immunity. See Kaufman, Chilling Judicial Independence, 88 Yale L. J. 681, 690–706 (1979). Congressmen may be removed from office by a vote of their colleagues. U. S. Const., Art. I, § 5, cl. 2.

[40] Prior to petitioner Nixon's resignation from office, the House Judiciary Committee had convened impeachment hearings. See generally Report of the Committee on the Judiciary of the House of Representatives: Impeachment of Richard M. Nixon, President of the United States, H. R. Rep. No. 93–1305 (1974).

The existence of alternative remedies and deterrents establishes that absolute immunity will not place the President "above the law." [41]   For the President, as for judges and prosecutors, absolute immunity merely precludes a particular private remedy for alleged misconduct in order to advance compelling public ends.

## VI

For the reasons stated in this opinion, the decision of the Court of Appeals is reversed, and the case is remanded for action consistent with this opinion.

*So ordered.*

CHIEF JUSTICE BURGER, concurring.

I join the Court's opinion, but I write separately to underscore that the Presidential immunity derives from and is mandated by the constitutional doctrine of separation of powers.   Indeed, it has been taken for granted for nearly two centuries. [1]   In reaching this conclusion we do well to bear in mind that the focus must not be simply on the matter of judg-

---

[41] The dissenting opinions argue that our decision places the President "above the law."   This contention is rhetorically chilling but wholly unjustified.   The remedy of impeachment demonstrates that the President remains accountable under law for his misdeeds in office.   This case involves only a damages remedy.   Although the President is not liable in civil damages for official misbehavior, that does not lift him "above" the law.   The dissents do not suggest that a judge is "above" the law when he enters a judgment for which he cannot be held answerable in civil damages; or a prosecutor is above the law when he files an indictment; or a Congressman is above the law when he engages in legislative speech or debate.   It is simply error to characterize an official as "above the law" because a particular remedy is not available against him.

[1] Presidential immunity for official acts while in office has never been seriously questioned until very recently.   *Ante,* at 750–752, n. 31.   I can find only one instance in which, prior to our decision in *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), a citizen sued a former President for acts committed while in office.   A suit against Thomas Jefferson was dismissed for being improperly brought in Virginia, thus precluding the necessity of reaching any immunity issue.   *Livingston* v. *Jefferson,* 15 F. Cas. 660 (No. 8,411) (CC Va. 1811).

ing individual conduct in a fact-bound setting; rather, in those familiar terms of John Marshall, it is a *Constitution* we are expounding. Constitutional adjudication often bears unpalatable fruit. But the needs of a system of government sometimes must outweigh the right of individuals to collect damages.

It strains the meaning of the words used to say this places a President "above the law." *United States* v. *Nixon,* 418 U. S. 683 (1974). The dissents are wide of the mark to the extent that they imply that the Court today recognizes sweeping immunity for a President for all acts. The Court does no such thing. The immunity is limited to civil damages claims. Moreover, a President, like Members of Congress, judges, prosecutors, or congressional aides—all having absolute immunity—are not immune for acts outside official duties.[2] *Ante,* at 753–755. Even the broad immunity of the Speech and Debate Clause has its limits.[3]

---

[2] In their "parade of horribles" and lamentations, the dissents also wholly fail to acknowledge why the same perils they fear are not present in the absolute immunity the law has long recognized for numerous other officials. At least 75,000 public officers have absolute immunity from civil damages suits for acts within the scope of their official functions. The dissenting opinions manifest an astonishing blind side in pointing to that old reliable that "no man is above the law." The Court has had no difficulty expanding the absolute immunity of Members of Congress, and in granting derivative absolute immunity to numerous aides of Members. *Gravel* v. *United States,* 408 U. S. 606 (1972).

We have since recognized absolute immunity for judges, *Stump* v. *Sparkman,* 435 U. S. 349 (1978), and for prosecutors, *Imbler* v. *Pachtman,* 424 U. S. 409 (1976), yet the Constitution provides no hint that either judges, prosecutors, or congressional aides should be so protected. Absolute immunity for judges and prosecutors is seen to derive from the common law and public policy, which recognize the need to protect judges and prosecutors from harassment. The potential danger to the citizenry from the malice of thousands of prosecutors and judges is at once more pervasive and less open to constant, public scrutiny than the actions of a President.

[3] In *United States* v. *Brewster,* 408 U. S. 501 (1972), we held that the Speech and Debate Clause does not prohibit prosecution of a Senator for accepting a bribe designed to influence his legislative acts.

In his dissenting opinion, JUSTICE WHITE confuses "judicial process" in the subpoena sense with a civil damages suit. *Post*, at 778, n. 23. He quotes language from *United States* v. *Nixon, supra,* at 706, as though that language has some relevance to the matter of immunity from civil damages:

> "[N]either the doctrine of separation of powers, nor the need for confidentiality . . . without more, can sustain an absolute, unqualified Presidential privilege of immunity from *judicial process* under all circumstances." *Post*, at 782. (Emphasis added.)

First, it is important to remember that the context of that language is a *criminal* prosecution. Second, the "judicial process" referred to was, as in *United States* v. *Burr*, 25 F. Cas. 30 (No. 14,692d) (CC Va. 1807) (Marshall, C. J., sitting at trial as Circuit Justice), a *subpoena* to the President to produce relevant evidence in a criminal prosecution. No issue of damages immunity was involved either in *Burr* or *United States* v. *Nixon.* In short, the quoted language has no bearing whatever on a *civil* action for damages. It is one thing to say that a President must produce evidence relevant to a criminal case, as in *Burr* and *United States* v. *Nixon,* and quite another to say a President can be held for civil damages for dismissing a federal employee. If the dismissal is wrongful the employee can be reinstated with backpay, as was done here. See n. 5, *infra.*

The immunity of a President from civil suits is not simply a doctrine derived from this Court's interpretation of common law or public policy. Absolute immunity for a President for acts within the official duties of the Chief Executive is either to be found in the constitutional separation of powers or it does not exist. The Court today holds that the Constitution mandates such immunity and I agree.

The essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of

government within its assigned sphere of responsibility, free from risk of control, interference, or intimidation by other branches. *United States* v. *Nixon, supra; Gravel* v. *United States*, 408 U. S. 606, 617 (1972). Even prior to the adoption of our Constitution, as well as after, judicial review of legislative action was recognized in some instances as necessary to maintain the proper checks and balances. *Den on the Dem. of Bayard & Wife* v. *Singleton*, 3 N. C. 42 (1787); *Cases of the Judges of the Court of Appeals*, 8 Va. 135 (1788). Cf. *Marbury* v. *Madison*, 1 Cranch 137 (1803). However, the Judiciary always must be hesitant to probe into the elements of Presidential decisionmaking, just as other branches should be hesitant to probe into judicial decisionmaking. Such judicial intervention is not to be tolerated absent imperative constitutional necessity. *United States* v. *Nixon, supra*, at 709–716.[4] The Court's opinion correctly observes that judicial intrusion through private damages actions improperly impinges on and hence interferes with the independence that is imperative to the functioning of the office of a President.

---

[4] JUSTICE WHITE suggests that prior to today, Presidents, prosecutors, judges, congressional aides, and other officials "could have been *held liable* for the kind of claim put forward by Fitzgerald—a personnel decision allegedly made for unlawful reasons." *Post*, at 767, n. 2 (emphasis added). But the law does not permit a plaintiff to recite "magic" words in pleadings and have the incantation operate to make these immunities vanish. JUSTICE WHITE errs fundamentally in treating all of the above officials as if the scope of their authority were identical. The authority of a President as head of the Executive Branch of our Government—a wholly unique office—is far broader than that of any other official. As the Court notes, a President has authority in the course of personnel changes in an executive department to make personnel decisions. If the decision is wrong, statutory remedies are provided. See n. 5, *infra*. This is not to say that, in a given case, it would not be appropriate to raise the question *whether* an official—even a President—had acted within the scope of the official's constitutional and statutory duties. The doctrine of absolute immunity does not extend beyond such actions.

Exposing a President to civil damages actions for official acts within the scope of the Executive authority would inevitably subject Presidential actions to undue judicial scrutiny as well as subject the President to harassment. The enormous range and impact of Presidential decisions—far beyond that of any one Member of Congress—inescapably means that many persons will consider themselves aggrieved by such acts. Absent absolute immunity, every person who feels aggrieved would be free to bring a suit for damages, and each suit—especially those that proceed on the merits—would involve some judicial questioning of Presidential acts, including the reasons for the decision, how it was arrived at, the information on which it was based, and who supplied the information. Such scrutiny of day-to-day decisions of the Executive Branch would be bound to occur if civil damages actions were made available to private individuals. Although the individual who claims wrongful conduct may indeed have sustained some injury, the need to prevent large-scale invasion of the Executive function by the Judiciary far outweighs the need to vindicate the private claims. We have decided that in a similar sense Members of both Houses of Congress—and their aides—must be totally free from judicial scrutiny for legislative acts; the public interest, in other words, outweighs the need for private redress of one claiming injury from legislative acts of a Member or aide of a Member.[5] The Court's concern (and the even more emphatic con-

---

[5] *Gravel* v. *United States*, 408 U. S. 606 (1972). The Federal Tort Claims Act of 1946 reflects this policy distinction; in it Congress waived sovereign immunity for certain damages claims, but pointedly excepted any "discretionary function or duty . . . whether or not the discretion involved be abused." 28 U. S. C. § 2680(a). Under the Act, damage resulting from *discretionary* governmental action is not subject to compensation. See, *e. g., Dalehite* v. *United States*, 346 U. S. 15 (1953). For uncompensated injuries Congress may in its discretion provide separate nonjudicial remedies such as private bills.

In this case Fitzgerald received substantial relief through the route provided by Congress: the Civil Service Commission ordered him reinstated with backpay. App. 87a–88a. Similarly situated persons are therefore

cerns expressed by JUSTICE WHITE's dissent) over "unremedied wrongs" to citizens by a President seem odd when one compares the potential for "wrongs" which thousands of congressional aides, prosecutors, and judges can theoretically inflict—with absolute immunity—on the same citizens for whom this concern is expressed. See n. 2, *supra.*

Judicial intervention would also inevitably inhibit the processes of Executive Branch decisionmaking and impede the functioning of the Office of the President. The need to defend damages suits would have the serious effect of diverting the attention of a President from his executive duties since defending a lawsuit today—even a lawsuit ultimately found to be frivolous—often requires significant expenditures of time and money, as many former public officials have learned to their sorrow. This very case graphically illustrates the point. When litigation processes are not tightly controlled—and often they are not—they can be and are used as mechanisms of extortion. Ultimate vindication on the merits does not repair the damage.[6]

I fully agree that the constitutional concept of separation of independent coequal powers dictates that a President be immune from civil damages actions based on acts within the scope of Executive authority while in office.[7] Far from plac-

---

not without an adequate remedy. But see *post,* at 797 (WHITE, J., dissenting). In addition, respondent Fitzgerald has also received a settlement of $142,000. It can hardly be said he has had no remedy.

[6] Judge Learned Hand described his feelings:

"After now some dozen years of experience I must say that as a litigant I should dread a lawsuit beyond almost anything else short of sickness and death." 3 Lectures on Legal Topics, Association of the Bar of the City of New York 105 (1926).

[7] The Court suggests that "we need not address directly" whether Congress could create a damages action against a President. *Ante,* at 748, n. 27. However, the Court's holding, in my view, effectively resolves that issue; once it is established that the Constitution confers absolute immunity, as the Court holds today, legislative action cannot alter that result. Nothing in the Court's opinion is to be read as suggesting that a constitu-

ing a President above the law, the Court's holding places a President on essentially the same footing with judges and other officials whose absolute immunity we have recognized.

JUSTICE WHITE, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

The four dissenting Members of the Court in *Butz* v. *Economou*, 438 U. S. 478 (1978), argued that all federal officials are entitled to absolute immunity from suit for any action they take in connection with their official duties. That immunity would extend even to actions taken with express knowledge that the conduct was clearly contrary to the controlling statute or clearly violative of the Constitution. Fortunately, the majority of the Court rejected that approach: We held that although public officials perform certain functions that entitle them to absolute immunity, the immunity attaches to particular functions—not to particular offices. Officials performing functions for which immunity is not absolute enjoy qualified immunity; they are liable in damages only if their conduct violated well-established law and if they should have realized that their conduct was illegal.

The Court now applies the dissenting view in *Butz* to the Office of the President: A President, acting within the outer boundaries of what Presidents normally do, may, without liability, deliberately cause serious injury to any number of citizens even though he knows his conduct violates a statute or tramples on the constitutional rights of those who are injured. Even if the President in this case ordered Fitzgerald fired by means of a trumped-up reduction in force, knowing that such a discharge was contrary to the civil service laws, he would be absolutely immune from suit. By the same token, if a President, without following the statutory procedures which he knows apply to himself as well as to other fed-

tional holding of this Court can be legislatively overruled or modified. *Marbury* v. *Madison*, 1 Cranch 137 (1803).

eral officials, orders his subordinates to wiretap or break into a home for the purpose of installing a listening device, and the officers comply with his request, the President would be absolutely immune from suit. He would be immune regardless of the damage he inflicts, regardless of how violative of the statute and of the Constitution he knew his conduct to be, and regardless of his purpose.[1]

The Court intimates that its decision is grounded in the Constitution. If that is the case, Congress cannot provide a remedy against Presidential misconduct and the criminal laws of the United States are wholly inapplicable to the President. I find this approach completely unacceptable. I do not agree that if the Office of President is to operate effectively, the holder of that Office must be permitted, without fear of liability and regardless of the function he is performing, deliberately to inflict injury on others by conduct that he knows violates the law.

We have not taken such a scatter-gun approach in other cases. *Butz* held that absolute immunity did not attach to the office held by a member of the President's Cabinet but only to those specific functions performed by that officer for which absolute immunity is clearly essential. Members of Congress are absolutely immune under the Speech or Debate Clause of the Constitution, but the immunity extends only to their legislative acts. We have never held that in order for legislative work to be done, it is necessary to immunize all of the tasks that legislators must perform. Constitutional immunity does not extend to those many things that Senators and Representatives regularly and necessarily do that are not legislative acts. Members of Congress, for example, repeatedly importune the executive branch and administrative agencies outside hearing rooms and legislative halls, but they are not immune if in connection with such activity they de-

---

[1] This, of course, is not simply a hypothetical example. See *Halperin* v. *Kissinger*, 196 U. S. App. D. C. 285, 606 F. 2d 1192 (1979), aff'd by an equally divided Court, 452 U. S. 713 (1981).

liberately violate the law. *United States* v. *Brewster*, 408 U. S. 501 (1972), for example, makes this clear. Neither is a Member of Congress or his aide immune from damages suits if in order to secure information deemed relevant to a legislative investigation, he breaks into a house and carries away records. *Gravel* v. *United States*, 408 U. S. 606 (1972). Judges are absolutely immune from liability for damages, but only when performing a judicial function, and even then they are subject to criminal liability. See *Dennis* v. *Sparks*, 449 U. S. 24, 31 (1980); *O'Shea* v. *Littleton*, 414 U. S. 488, 503 (1974). The absolute immunity of prosecutors is likewise limited to the prosecutorial function. A prosecutor who directs that an investigation be carried out in a way that is patently illegal is not immune.

In *Marbury* v. *Madison*, 1 Cranch 137, 165 (1803), the Court, speaking through The Chief Justice, observed that while there were "important political powers" committed to the President for the performance of which neither he nor his appointees were accountable in court, "the question, whether the legality of an act of the head of a department be examinable in a court of justice or not, must always depend on the nature of that act." The Court nevertheless refuses to follow this course with respect to the President. It makes no effort to distinguish categories of Presidential conduct that should be absolutely immune from other categories of conduct that should not qualify for that level of immunity. The Court instead concludes that whatever the President does and however contrary to law he knows his conduct to be, he may, without fear of liability, injure federal employees or any other person within or without the Government.

Attaching absolute immunity to the Office of the President, rather than to particular activities that the President might perform, places the President above the law. It is a reversion to the old notion that the King can do no wrong. Until now, this concept had survived in this country only in the form of sovereign immunity. That doctrine forecloses suit against the Government itself and against Government offi-

cials, but only when the suit against the latter actually seeks relief against the sovereign. *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682, 687 (1949). Suit against an officer, however, may be maintained where it seeks specific relief against him for conduct contrary to his statutory authority or to the Constitution. *Id.*, at 698. Now, however, the Court clothes the Office of the President with sovereign immunity, placing it beyond the law.[2]

---

[2] It is ironic that this decision should come out at the time of the tenth anniversary of the Watergate affair. Even the popular press has drawn from that affair an insight into the character of the American constitutional system that is bound to be profoundly shaken by today's decision: "The important lesson that Watergate established is that no President is above the law. It is a banality, a cliche, but it is a point on which many Americans . . . seem confused." 119 Time, No. 24, p. 28 (June 14, 1982). A majority of the Court shares this confusion.

The majority vigorously protests this characterization of its position, *ante*, at 758, n. 41, arguing that the President remains subject to law in the form of impeachment proceedings. But the abandonment of the rule of law here is not in the result reached, but in the manner of reaching it. The majority fails to apply to the President those principles which we have consistently used to determine the scope and credibility of an absolute immunity defense. It does this because of some preconceived notion of the inapplicability of general rules of law to the President.

Similarly, THE CHIEF JUSTICE, like the majority, misses the point in his wholly unconvincing contentions that the Court today does no more than extend to the President the same sort of immunity that we have recognized with respect to Members of Congress, judges, prosecutors, and legislative aides. In none of our previous cases have we extended absolute immunity to all actions "within the scope of the official's constitutional and statutory duties." Concurring opinion of THE CHIEF JUSTICE, *ante*, at 761, n. 4. Indeed, under the immunity doctrine as it existed prior to today's decision, each of these officials could have been held liable for the kind of claim put forward by Fitzgerald—a personnel decision allegedly made for unlawful reasons. Although such a decision falls within the scope of an official's duties, it does not fall within the judicial, legislative, or prosecutorial functions to which absolute immunity attaches. THE CHIEF JUSTICE's failure to grasp the difference between the functional approach to absolute immunity that we have previously adopted and the nature of today's decision accounts for his misunderstanding of this dissent.

In *Marbury* v. *Madison*, *supra*, at 163, The Chief Justice, speaking for the Court, observed: "The Government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." Until now, the Court has consistently adhered to this proposition. In *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974), a unanimous Court held that the Governor of a State was entitled only to a qualified immunity. We reached this position, even though we recognized that

> "[i]n the case of higher officers of the executive branch . . . the inquiry is far more complex since the range of decisions and choices—whether the formulation of policy, of legislation, of budgets, or of day-to-day decisions—is virtually infinite. . . . In short, since the options which a chief executive and his principal subordinates must consider are far broader and far more subtle than those made by officials with less responsibility, the range of discretion must be comparably broad." *Id.*, at 246–247.

As JUSTICE BRENNAN observed in *McGautha* v. *California*, 402 U. S. 183, 252–253 (1971) (dissenting opinion): "The principle that our Government shall be of laws and not of men is so strongly woven into our constitutional fabric that it has found recognition in not just one but several provisions of the Constitution" (footnote omitted). And as THE CHIEF JUSTICE said in *Complete Auto Transit, Inc.* v. *Reis*, 451 U. S. 401, 429 (1981) (dissenting opinion):

> "Accountability of each individual for individual conduct lies at the core of all law—indeed, of all organized societies. The trend to eliminate or modify sovereign immunity is not an unrelated development; we have moved away from 'The King can do no wrong.' This

> principle of individual accountability is fundamental if the structure of an organized society is not to be eroded to anarchy and impotence, and it remains essential in civil as well as criminal justice."

Unfortunately, the Court now abandons basic principles that have been powerful guides to decision. It is particularly unfortunate since the judgment in this case has few, if any, indicia of a judicial decision; it is almost wholly a policy choice, a choice that is without substantial support and that in all events is ambiguous in its reach and import.

We have previously stated that "the law of privilege as a defense to damages actions against officers of Government has 'in large part been of judicial making.'" *Butz* v. *Economou*, 438 U. S., at 501–502, quoting *Barr* v. *Matteo*, 360 U. S. 564, 569 (1959). But this does not mean that the Court has simply "enacted" its own view of the best public policy. No doubt judicial convictions about public policy—whether and what kind of immunity is necessary or wise—have played a part, but the courts have been guided and constrained by common-law tradition, the relevant statutory background, and our constitutional structure and history. Our cases dealing with the immunity of Members of Congress are constructions of the Speech or Debate Clause and are guided by the history of such privileges at common law. The decisions dealing with the immunity of state officers involve the question of whether and to what extent Congress intended to abolish the common-law privileges by providing a remedy in the predecessor of 42 U. S. C. § 1983 for constitutional violations by state officials. Our decisions respecting immunity for federal officials—including absolute immunity for judges, prosecutors, and those officials doing similar work—also in large part reflect common-law views, as well as judicial conclusions as to what privileges are necessary if particular functions are to be performed in the public interest.

Unfortunately, there is little of this approach in the Court's decision today. The Court casually, but candidly, abandons the functional approach to immunity that has run through all of our decisions. *Ante*, at 755–756. Indeed, the majority turns this rule on its head by declaring that because the functions of the President's office are so varied and diverse and some of them so profoundly important, the office is unique and must be clothed with officewide, absolute immunity. This is policy, not law, and in my view, very poor policy.

## I

In declaring the President to be absolutely immune from suit for any deliberate and knowing violation of the Constitution or of a federal statute, the Court asserts that the immunity is "rooted in the constitutional tradition of the separation of powers and supported by our history."[3] *Ante*, at 749. The decision thus has all the earmarks of a constitutional pronouncement—absolute immunity for the President's office is mandated by the Constitution. Although the Court appears to disclaim this, *ante*, at 748–749, n. 27, it is difficult to read the opinion coherently as standing for any narrower proposition: Attempts to subject the President to liability either by Congress through a statutory action or by the courts through a *Bivens* (*Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971)) proceeding would violate the separation of powers.[4] Such a generalized absolute immunity cannot be sustained when examined in the traditional manner and in light of the traditional judicial sources.

The petitioner and the United States, as *amicus*,[5] rely principally on two arguments to support the claim of absolute

---

[3] Although the majority opinion initially claims that its conclusion is based substantially on "our history," historical analysis in fact plays virtually no part in the analysis that follows.

[4] On this point, I am in agreement with the concurring opinion of THE CHIEF JUSTICE.

[5] The Solicitor General relies entirely upon the brief filed by his office for petitioners in *Kissinger* v. *Halperin*, 452 U. S. 713 (1981).

immunity for the President from civil liability: absolute immunity is an "incidental power" of the Presidency, historically recognized as implicit in the Constitution, and absolute immunity is required by the separation-of-powers doctrine. I will address each of these contentions.

## A

The Speech or Debate Clause, Art. I, § 6, guarantees absolute immunity to Members of Congress; nowhere, however, does the Constitution directly address the issue of Presidential immunity.[6] Petitioner nevertheless argues that the debates at the Constitutional Convention and the early history of constitutional interpretation demonstrate an implicit assumption of absolute Presidential immunity. In support of this position, petitioner relies primarily on three separate items: First, preratification remarks made during the discussion of Presidential impeachment at the Convention and in The Federalist; second, remarks made during the meeting of the first Senate; and third, the views of Justice Story.

The debate at the Convention on whether or not the President should be impeachable did touch on the potential dangers of subjecting the President to the control of another branch, the Legislature.[7] Gouverneur Morris, for example, complained of the potential for dependency and argued that "[the President] can do no criminal act without Coadjutors who may be punished. In case he should be re-elected, that will be sufficient proof of his innocence."[8] Colonel Mason

---

[6] In fact, insofar as the Constitution addresses the issue of Presidential liability, its approach is very different from that taken in the Speech or Debate Clause. The possibility of impeachment assures that the President can be held accountable to the other branches of Government for his actions; the Constitution further states that impeachment does not bar criminal prosecution.

[7] The debate is recorded in 2 M. Farrand, Records of the Federal Convention of 1787, pp. 64–69 (1911) (hereinafter Farrand).

[8] *Id.*, at 64.

responded to this by asking if "any man [shall] be above Justice" and argued that this was least appropriate for the man "who can commit the most extensive injustice."[9]  Madison agreed that "it [is] indispensable that some provision should be made for defending the Community agst the incapacity, negligence or perfidy of the chief Magistrate."[10]  Pinckney responded on the other side, believing that if granted the power, the Legislature would hold impeachment "as a rod over the Executive and by that means effectually destroy his independence."[11]

Petitioner concludes from this that the delegates meant impeachment to be the exclusive means of holding the President personally responsible for his misdeeds, outside of electoral politics.  This conclusion, however, is hardly supported by the debate.  Although some of the delegates expressed concern over limiting Presidential independence, the delegates voted 8 to 2 in favor of impeachment.  Whatever the fear of subjecting the President to the power of another branch, it was not sufficient, or at least not sufficiently shared, to insulate the President from political liability in the impeachment process.

Moreover, the Convention debate did not focus on wrongs the President might commit against individuals, but rather on whether there should be a method of holding him accountable for what might be termed wrongs against the state.[12] Thus, examples of the abuses that concerned delegates were betrayal, oppression, and bribery; the delegates feared that the alternative to an impeachment mechanism would be "tumults & insurrections" by the people in response to such

---

[9] *Id.*, at 65.

[10] *Ibid.*

[11] *Id.*, at 66.

[12] In The Federalist No. 65, p. 439 (J. Cooke ed. 1961), Alexander Hamilton described impeachable offenses as follows: "They are of a nature which may with peculiar propriety be denominated POLITICAL, as they relate chiefly to injuries done immediately to the society itself."

abuses. 2 Farrand 67. The only conclusions that can be drawn from this debate are that the independence of the Executive was not understood to require a total lack of accountability to the other branches and that there was no general desire to insulate the President from the consequences of his improper acts.[13]

Much the same can be said in response to petitioner's reliance on The Federalist No. 77. In that essay, Hamilton asked whether the Presidency combines "the requisites to safety in the republican sense—a due dependence on the people—a due responsibility." The Federalist No. 77, p. 520 (J. Cooke ed. 1961). He answered that the constitutional plan met this test because it subjected the President to both the electoral process and the possibility of impeachment, including subsequent criminal prosecution. Petitioner concludes from this that these were intended to be the exclusive means of restraining Presidential abuses. This, by no means follows. Hamilton was concerned in The Federalist No. 77, as were the delegates at the Convention, with the larger political abuses—"wrongs against the state"—that a President might commit. He did not consider what legal means might be available for redress of individualized grievances.[14]

---

[13] The majority's use of the historical record is in line with its other arguments: It puts the burden on respondent to demonstrate no Presidential immunity, rather than on petitioner to prove the appropriateness of this defense. Thus, while noting that the doubts of some of the Framers were not sufficient to prevent the adoption of the Impeachment Clause, the majority nevertheless states that "nothing in [the] debates suggests an expectation that the President would be subjected to [civil damages actions]." *Ante*, at 751, n. 31. Of course, nothing in the debates suggests an expectation that the President would not be liable in civil suits for damages either. Nevertheless, the debates are one element that the majority cites to support its conclusion that "[t]he best historical evidence clearly supports the Presidential immunity we have upheld." *Ante*, at 752, n. 31.

[14] Other commentary on the proposed Constitution did, however, consider the subject of Presidential immunity. In fact, the subject was discussed in the first major defense of the Constitution published in the United States. In his essays on the Constitution, published in the Inde-

That omission should not be taken to imply exclusion in these circumstances is well illustrated by comparing some of the remarks made in the state ratifying conventions with Hamilton's discussion in No. 77. In the North Carolina ratifying convention, for example, there was a discussion of the adequacy of the impeachment mechanism for holding executive officers accountable for their misdeeds. Governor Johnson defended the constitutional plan by distinguishing three legal mechanisms of accountability:

> "If an officer commits an offence against an individual, he is amenable to the courts of law. If he commits crimes against the state, he may be indicted and punished. Impeachment only extends to high crimes and misdemeanors in a *public office*. It is a mode of trial pointed out for great misdemeanors against the public."[15]

Governor Johnson surely did not contemplate that the availability of an impeachment mechanism necessarily implied the exclusion of other forms of legal accountability; rather, the method of accountability was to be a function of the character of the wrong. Mr. Maclaine, another delegate to the North Carolina Convention, clearly believed that the courts would remain open to individual citizens seeking redress from injuries caused by Presidential acts:

> "The President is the superior officer, who is to see the laws put in execution. He is amenable for any maladministration in his office. Were it possible to suppose that the President should give wrong instructions to his

---

pendent Gazetteer in September 1787, Tench Coxe included the following statement in his description of the limited power of the proposed Office of the President: *"His person is not so much protected as that of a member of the House of Representatives; for he may be proceeded against like any other man in the ordinary course of law."* Quoted in 2 The Documentary History of the Ratification of the Constitution 141 (1976) (emphasis in original).

[15] 4 J. Elliot, Debates on the Federal Constitution 48 (1876 ed.).

deputies, whereby the citizens would be distressed, they would have redress in the ordinary courts of common law."[16]

A similar distinction between different possible forms of Presidential accountability was drawn by Mr. Wilson at the Pennsylvania ratifying convention:

"[The President] is placed high, and is possessed of power far from being contemptible; yet not a *single privilege* is annexed to his character; far from being above the laws, he is amenable to them in his private character as a citizen, and in his public character by *impeachment.*"[17]

There is no more reason to respect the views of Hamilton than those of Wilson: both were members of the Constitutional Convention; both were instrumental in securing the ratification of the Constitution. But more importantly, there is simply no express contradiction in their statements. Petitioner relies on an inference drawn from silence to create this contradiction. The surrounding history simply does not support this inference.

The second piece of historical evidence cited by petitioner is an exchange at the first meeting of the Senate, involving Vice President Adams and Senators Ellsworth and Maclay. The debate started over whether or not the words "the President" should be included at the beginning of federal writs, similar to the manner in which English writs ran in the King's name. Senator Maclay thought that this would improperly combine the executive and judicial branches. This, in turn, led to a discussion of the proper relation between the two. Senator Ellsworth and Vice President Adams defended the proposition that

"the President, personally, was not subject to any process whatever; could have no action, whatever, brought

---

[16] *Id.*, at 47.

[17] 2 *id.*, at 480.

against him; was above the power of all judges, justices, &c. For [that] would . . . put it in the power of a common justice to exercise any authority over him, and stop the whole machine of government." [18]

In their view the impeachment process was the exclusive form of process available against the President. Senator Maclay ardently opposed this view and put the case of a President committing "murder in the street." In his view, in such a case neither impeachment nor resurrection were the exclusive means of holding the President to the law; rather, there was "loyal justice." Senator Maclay, who recorded the exchange, concludes his notes with the remark that none of this "is worth minuting, but it shows clearly how amazingly fond of the old leaven many people are." [19] In his view, Senator Ellsworth and his supporters had not fully comprehended the difference in the political position of the American President and that of the British Monarch. Again, nothing more can be concluded from this than that the proper scope of Presidential accountability, including the question whether the President should be subject to judicial process, was no clearer then than it is now.

The final item cited by petitioner clearly supports his position, but is of such late date that it contributes little to understanding the original intent. In his Commentaries on the Constitution, published in 1833, Justice Story described the "incidental powers" of the President:

"Among these must necessarily be included the power to perform [his functions] without any obstruction or impediment whatsoever. The President cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; and for this purpose his person must be deemed, in civil cases

---

[18] W. Maclay, Sketches of Debate in the First Senate of the United States in 1789–1791, p. 152 (1969 reprint).

[19] *Ibid.*

at least, to possess an official inviolability. In the exercise of his political powers he is to use his own discretion, and he is accountable only to his country and to his own conscience. His decision in relation to these powers is subject to no control, and his discretion, when exercised, is conclusive." [20]

While Justice Story may have been firmly committed to this view in 1833, Senator Pinckney, a delegate to the Convention, was as firmly committed to the opposite view in 1800. [21]

Senator Pinckney, arguing on the floor of the Senate, contrasted the privileges extended to Members of Congress by the Constitution with the lack of any such privileges extended to the President. [22] He argued that this was a deliberate choice of the delegates to the Convention, who "well knew how oppressively the power of undefined privileges had been exercised in Great Britain, and were determined no such authority should ever be exercised here." 10 Annals of

---

[20] 2 J. Story, Commentaries on the Constitution of the United States § 1569, p. 372 (4th ed. 1873).

[21] It is not possible to determine whether this is the same Pinckney that Madison recorded as Pinkney, who objected at the Convention to granting a power of impeachment to the Legislature. Two Charles Pinckneys attended the Convention. Both were from South Carolina. See 3 Farrand 559.

[22] Senator Pinckney's comments are recorded at 10 Annals of Cong. 69–83 (1800). Petitioner contends that these remarks are not relevant because they concerned only the authority of Congress to inquire into the origin of an allegedly libelous newspaper article. Reply Brief for Petitioner 7. Although this was the occasion for the remarks, Pinckney did discuss the immunity of Members of Congress as a privilege embodied in the Speech or Debate Clause: "[O]ur Constitution supposes no man . . . to be infallible, but considers them all as mere men, and subject to all the passions, and frailties, and crimes, that men generally are, and accordingly provides for the trial of such as ought to be tried, and leaves the members of the Legislature, for their proceedings, to be amenable to their constituents and to public opinion . . . ." 10 Annals of Cong. 71 (1800). This, then, was one of the privileges of Congress that he was contrasting with those extended (or not extended) to the President.

Cong. 72 (1800). Therefore, "[n]o privilege of this kind was intended for your Executive, nor any except that . . . for your Legislature." *Id.*, at 74.[23]

In previous immunity cases the Court has emphasized the importance of the immunity afforded the particular government official at common law. See *Imbler* v. *Pachtman*, 424 U. S. 409, 421 (1976). Clearly this sort of analysis is not possible when dealing with an office, the Presidency, that did not exist at common law. To the extent that historical inquiry is appropriate in this context, it is constitutional history, not

---

[23] The majority cites one additional piece of historical evidence, a letter by President Jefferson, which it contends demonstrates that Jefferson believed that "the President was not intended to be subject to judicial process." *Ante*, at 751, n. 31.

Thomas Jefferson's views on the relation of the President to the judicial process are, however, not quite so clear as the majority suggests. Jefferson took a variety of positions on the proper relation of Executive and Judicial authority, at different points in his career. It would be surprising if President Jefferson had not argued strongly for such immunity from judicial process, particularly in a confrontation with Chief Justice Marshall. Jefferson's views on this issue before he became President would be of a good deal more significance. In this regard, it is significant that in Jefferson's second and third drafts of the Virginia Constitution, which also proposed a separation of the powers of government into three separate branches, he specifically proposed that the Executive be subject to judicial process: "[H]e shall be liable to action, tho' not to personal restraint for private duties or wrongs." 1 Papers of Thomas Jefferson 350, 360 (1950). Also significant is the fact that when Jefferson's followers tried to impeach Justice Chase in 1804–1805, one of the grounds of their attack on him was that he had refused to subpoena President Adams during the trial of Dr. Cooper for sedition. See E. Corwin, The President: Office and Powers 113 (4th ed. 1957). Finally, it is worth noting that even in the middle of the debate over Chief Justice Marshall's power to subpoena the President during the Burr trial, Jefferson looked to a legislative solution of the confrontation: "I hope however that . . . at the ensuing session of the legislature [the Chief Justice] may have means provided for giving to individuals the benefit of the testimony of the [Executive] functionaries in proper cases." 10 The Works of Thomas Jefferson 407 n. (P. Ford ed. 1905) (quoting a letter from President Jefferson to George Hay, United States District Attorney for Virginia).

common law, that is relevant. From the history discussed above, however, all that can be concluded is that absolute immunity from civil liability for the President finds no support in constitutional text or history, or in the explanations of the earliest commentators. This is too weak a ground to support a declaration by this Court that the President is absolutely immune from civil liability, regardless of the source of liability or the injury for which redress is sought. This much the majority implicitly concedes since history and text, traditional sources of judicial argument, merit only a footnote in the Court's opinion. *Ante*, at 750–752, n. 31.

## B

No bright line can be drawn between arguments for absolute immunity based on the constitutional principle of separation of powers and arguments based on what the Court refers to as "public policy." This necessarily follows from the Court's functional interpretation of the separation-of-powers doctrine:

> "[I]n determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 443 (1977).

See also *United States* v. *Nixon*, 418 U. S. 683, 706–707 (1974); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J., concurring). Petitioner argues that public policy favors absolute immunity because absent such immunity the President's ability to execute his constitutionally mandated obligations will be impaired. The convergence of these two lines of argument is superficially apparent from the very fact that in both instances the approach of the Court has been characterized as a "functional" analysis.

The difference is only one of degree. While absolute immunity might maximize executive efficiency and therefore be

a worthwhile policy, lack of such immunity may not so disrupt the functioning of the Presidency as to violate the separation-of-powers doctrine. Insofar as liability in this case is of congressional origin, petitioner must demonstrate that subjecting the President to a private damages action will prevent him from "accomplishing [his] constitutionally assigned functions." Insofar as liability is based on a *Bivens* action, perhaps a lower standard of functional disruption is appropriate. Petitioner has surely not met the former burden; I do not believe that he has met the latter standard either.

Taken at face value, the Court's position that as a matter of constitutional law the President is absolutely immune should mean that he is immune not only from damages actions but also from suits for injunctive relief, criminal prosecutions and, indeed, from any kind of judicial process. But there is no contention that the President is immune from criminal prosecution in the courts under the criminal laws enacted by Congress or by the States for that matter. Nor would such a claim be credible. The Constitution itself provides that impeachment shall not bar "Indictment, Trial, Judgment and Punishment, according to Law." Art. I, §3, cl. 7. Similarly, our cases indicate that immunity from damages actions carries no protection from criminal prosecution. *Supra*, at 765–766.

Neither can there be a serious claim that the separation-of-powers doctrine insulates Presidential action from judicial review or insulates the President from judicial process. No argument is made here that the President, whatever his liability for money damages, is not subject to the courts' injunctive powers. See, *e. g., Youngstown Sheet & Tube Co., supra; Korematsu v. United States*, 323 U. S. 214 (1944); *Panama Refining Co. v. Ryan*, 293 U. S. 388 (1935). Petitioner's attempt to draw an analogy to the Speech or Debate Clause, Brief for Petitioner 45, one purpose of which is "to prevent . . . accountability before a possibly hostile judiciary," *Gravel v. United States*, 408 U. S., at 617, breaks

down at just this point. While the Speech or Debate Clause guarantees that "for any Speech or Debate" Congressmen "shall not be questioned in any other Place," and, thus, assures that Congressmen, in their official capacity, shall not be the subject of the courts' injunctive powers, no such protection is afforded the Executive. Indeed, as the cases cited above indicate, it is the rule, not the exception, that executive actions—including those taken at the immediate direction of the President—are subject to judicial review.[24] Regardless of the possibility of money damages against the President, then, the constitutionality of the President's actions or their legality under the applicable statutes can and will be subject to review. Indeed, in this very case, respondent Fitzgerald's dismissal was set aside by the Civil Service Commission as contrary to the applicable regulations issued pursuant to authority granted by Congress.

Nor can private damages actions be distinguished on the ground that such claims would involve the President personally in the litigation in a way not necessitated by suits seeking declaratory or injunctive relief against certain Presidential actions. The President has been held to be subject to judicial process at least since 1807. *United States* v. *Burr*, 25 F. Cas. 30 (No. 14,692d) (CC Va. 1807) (Marshall, C. J., sitting as Circuit Justice). *Burr* "squarely ruled that a subpoena may be directed to the President." *Nixon* v. *Sirica*, 159 U. S. App. D. C. 58, 67, 487 F. 2d 700, 709 (1973). Chief Justice Marshall flatly rejected any suggestion that all judicial process, in and of itself, constitutes an unwarranted interference in the Presidency:

---

[24] The Solicitor General, in fact, argues that the possibility of judicial review of Presidential actions supports the claim of absolute immunity: Judicial review "serves to contain and correct the unauthorized exercise of the President's powers," making private damages actions unnecessary in order to achieve the same end. Brief for Petitioners in *Kissinger* v. *Halperin*, O. T. 1980, No. 79–880, p. 31. See n. 5, *supra*.

> "The guard, furnished to this high officer, to protect him from being harassed by *vexatious* and *unnecessary* subpoenas, is to be looked for in the conduct of a court after those subpoenas have issued; not in any circumstance which is to precede their being issued." 25 F. Cas., at 34 (emphasis added).

This position was recently rearticulated by the Court in *United States* v. *Nixon*, 418 U. S., at 706:

> "[N]either the doctrine of separation of powers, nor the need for confidentiality . . . without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances."

These two lines of cases establish, then, that neither subjecting Presidential actions to a judicial determination of their constitutionality, nor subjecting the President to judicial process violates the separation-of-powers doctrine. Similarly, neither has been held to be sufficiently intrusive to justify a judicially declared rule of immunity. With respect to intrusion by the judicial process itself on executive functions, subjecting the President to private claims for money damages involves no more than this. If there is a separation-of-powers problem here, it must be found in the nature of the *remedy* and not in the *process* involved.

We said in *Butz* v. *Economou*, 438 U. S. 478 (1978), that "it is not unfair to hold liable the official who knows or should know he is acting outside the law, and . . . insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment." *Id.,* at 506–507. Today's decision in *Harlow* v. *Fitzgerald, post,* p. 800, makes clear that the President, were he subject to civil liability, could be held liable only for an action that he knew, or as an objective matter should have known, was illegal and a clear abuse of his authority and power. In such circumstances, the question that must be answered is who should bear the cost of the resulting injury—the wrongdoer or the victim.

The principle that should guide the Court in deciding this question was stated long ago by Chief Justice Marshall: "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury* v. *Madison*, 1 Cranch, at 163. Much more recently, the Court considered the role of a damages remedy in the performance of the courts' traditional function of enforcing federally guaranteed rights: "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S., at 395.[25] To the extent that the Court denies an otherwise appropriate remedy, it denies the victim the right to be made whole and, therefore, denies him "the protection of the laws."[26]

That the President should have the same remedial obligations toward those whom he injures as any other federal officer is not a surprising proposition. The fairness of the remedial principle the Court has so far followed—that the wrongdoer, not the victim, should ordinarily bear the costs of the injury—has been found to be outweighed only in instances where potential liability is "thought to injure the governmental decisionmaking process." *Imbler* v. *Pachtman*, 424 U. S., at 437 (WHITE, J., concurring in judgment). The argument for immunity is that the possibility of a damages action will, or at least should, have an effect on the per-

---

[25] See also Justice Harlan's discussion of the appropriateness of the damages remedy in order to redress the violation of certain constitutional rights. *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S., at 407–410 (concurring in judgment).

[26] Contrary to the suggestion of the majority, *ante*, at 754–755, n. 37, I do not suggest that there must always be a remedy in civil damages for every legal wrong or that *Marbury* v. *Madison* stands for this proposition. *Marbury* does, however, suggest the importance of the private interests at stake within the broader perspective of a political system based on the rule of law. The functional approach to immunity questions, which we have previously followed but which the majority today discards, represented an appropriate reconciliation of the conflicting interests at stake.

formance of official responsibilities. That effect should be to deter unconstitutional, or otherwise illegal, behavior. This may, however, lead officers to be more careful and "less vigorous" in the performance of their duties. Caution, of course, is not always a virtue and undue caution is to be avoided.

The possibility of liability may, in some circumstances, distract officials from the performance of their duties and influence the performance of those duties in ways adverse to the public interest. But when this "public policy" argument in favor of absolute immunity is cast in these broad terms, it applies to all officers, both state and federal: All officers should perform their responsibilities without regard to those personal interests threatened by the possibility of a lawsuit. See *Imbler, supra,* at 436 (WHITE, J., concurring in judgment).[27] Inevitably, this reduces the public policy argument to nothing more than an expression of judicial inclination as to which officers should be encouraged to perform their functions with "vigor," although with less care.[28]

The Court's response, until today, to this problem has been to apply the argument to individual functions, not offices, and to evaluate the effect of liability on governmental decisionmaking within that function, in light of the substantive ends that are to be encouraged or discouraged. In this case, therefore, the Court should examine the functions implicated by the causes of action at issue here and the effect of potential liability on the performance of those functions.

---

[27] The Court has never held that the "public policy" conclusions it reaches as to the appropriateness of absolute immunity in particular instances are not subject to reversal through congressional action. Implicitly, therefore, the Court has already rejected a constitutionally based, separation-of-powers argument for immunity for federal officials.

[28] Surely the fact that officers of the court have been the primary beneficiaries of this Court's pronouncements of absolute immunity gives support to this appearance of favoritism.

## II

The functional approach to the separation-of-powers doctrine and the Court's more recent immunity decisions[29] converge on the following principle: The scope of immunity is determined by function, not office. The wholesale claim that the President is entitled to absolute immunity in all of his actions stands on no firmer ground than did the claim that all Presidential communications are entitled to an absolute privilege, which was rejected in favor of a functional analysis, by a unanimous Court in *United States* v. *Nixon,* 418 U. S. 683 (1974). Therefore, whatever may be true of the necessity of such a broad immunity in certain areas of executive responsibility,[30] the only question that must be answered here is whether the dismissal of employees falls within a constitutionally assigned executive function, the performance of which would be substantially impaired by the possibility of a private action for damages. I believe it does not.

Respondent has so far proceeded in this action on the basis of three separate causes of action: two federal statutes—5 U. S. C. § 7211 (1976 ed., Supp. IV) and 18 U. S. C. § 1505— and the First Amendment. At this point in the litigation, the availability of these causes of action is not before us. Assuming the correctness of the lower court's determination that the two federal statutes create a private right of action, I find the suggestion that the President is immune from those causes of action to be unconvincing. The attempt to found such immunity upon a separation-of-powers argument is particularly unconvincing.

The first of these statutes, 5 U. S. C. § 7211 (1976 ed., Supp. IV), states that "[t]he right of employees . . . to . . .

---

[29] See *Supreme Court of Virginia* v. *Consumers Union of United States,* 446 U. S. 719 (1980); *Butz* v. *Economou,* 438 U. S. 478, 511 (1978).

[30] I will not speculate on the Presidential functions which may require absolute immunity, but a clear example would be instances in which the President participates in prosecutorial decisions.

furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied." The second, 18 U. S. C. § 1505, makes it a crime to obstruct congressional testimony. It does not take much insight to see that at least one purpose of these statutes is to assure congressional access to information in the possession of the Executive Branch, which Congress believes it requires in order to carry out its responsibilities.[31] Insofar as these statutes implicate a separation-of-powers argument, I would think it to be just the opposite of that suggested by petitioner and accepted by the majority. In enacting these statutes, Congress sought to preserve its own constitutionally mandated functions in the face of a recalcitrant Executive.[32] Thus, the separation-of-powers problem addressed by these statutes was first of all Presidential behavior that intruded upon, or burdened, Congress' performance of its own constitutional responsibilities. It is no response to this to say that such a cause of action would disrupt the President in the

---

[31] See, e. g., 48 Cong. Rec. 4653 (1912) ("During my first session of Congress I was desirous of learning the needs of the postal service and inquiring into the conditions of the employees. To my surprise I found that under an Executive order these civil-service employees could not give me any information") (remarks of Rep. Calder); id., at 4656 ("I believe it is high time that Congress should listen to the appeals of these men and provide a way whereby they can properly present a petition to the Members of Congress for a redress of grievances without the fear of losing their official positions") (remarks of Rep. Reilly); id., at 5157 ("I have always requested employees to consult with me on matters affecting their interest and believe that it is my duty to listen to all respectful appeals and complaints") (remarks of Rep. Evans). Indeed, it is for just this reason that petitioners in Harlow v. Fitzgerald, post, p. 800, argue that the statutes do not create a private right of action: "5 U. S. C. § 7211 and 18 U. S. C. § 1505 were designed to protect the legislative process, not to give one such as Fitzgerald a right to seek damages." Brief for Petitioners, O. T. 1981, No. 80–945, p. 26, n. 11.

[32] Indeed, the impetus for passage of what is now 5 U. S. C. § 7211 (1976 ed., Supp. IV) was the imposition of "gag rules" upon testimony of civil servants before congressional committees. See Exec. Order No. 402 (Jan. 25, 1906); Exec. Order No. 1142 (Nov. 26, 1909).

furtherance of his responsibilities. That approach ignores the separation-of-powers problem that lies behind the congressional action; it assumes that Presidential functions are to be valued over congressional functions.

The argument that Congress, by providing a damages action under these statutes (as is assumed in this case), has adopted an unconstitutional means of furthering its ends, must rest on the premise that Presidential control of executive employment decisions is a constitutionally assigned Presidential function with which Congress may not significantly interfere. This is a frivolous contention. In *United States* v. *Perkins*, 116 U. S. 483, 485 (1886), this Court held that "when Congress, by law, vests the appointment of inferior officers in the heads of Departments it may limit and restrict the power of removal as it deems best for the public interest." Whatever the rule may be with respect to high officers, see *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935), with respect to those who fill traditional bureaucratic positions, restrictions on executive authority are the rule and not the exception.[33] This case itself demonstrates the severe statutory restraints under which the President operates in this area.

Fitzgerald was a civil service employee working in the Office of the Secretary of the Air Force. Although his position was such as to fall within the "excepted" service, which would ordinarily mean that civil service rules and regulations applicable to removals would not protect him, 5 CFR § 6.4 (1982), his status as a veteran entitled him to special protections. Veterans are entitled to certain civil service benefits afforded to "preference eligibles." 5 U. S. C. § 2108 (1976 ed. and Supp. IV). These benefits include that set forth in 5 U. S. C. § 7513(a) (1976 ed., Supp. IV): "[A]n agency may take [adverse action] against an employee only for such cause as will promote the efficiency of the serv-

---

[33] Thus, adverse action may generally be taken against civil servants only "for such cause as will promote the efficiency of the service." 5 U. S. C. §§ 7503, 7513, and 7543 (1976 ed., Supp. IV).

ice." Similarly, his veteran status entitled Fitzgerald to the protection of the reduction-in-force procedures established by civil service regulation. 5 U. S. C. §§ 3501, 3502 (1976 ed. and Supp. IV). It was precisely those procedures that the Chief Examiner for the Civil Service Commission found had been violated, in his 1973 recommendation that respondent be reappointed to his old position or to a job of comparable authority.

This brief review is enough to illustrate my point: Personnel decisions of the sort involved in this case are emphatically not a constitutionally assigned Presidential function that will tolerate no interference by either of the other two branches of Government. More important than this "quantitative" analysis of the degree of intrusion in Presidential decisionmaking permitted in this area, however, is the "qualitative" analysis suggested in Part I–B above.

Absolute immunity is appropriate when the threat of liability may bias the decisionmaker in ways that are adverse to the public interest. But as the various regulations and statutes protecting civil servants from arbitrary executive action illustrate, this is an area in which the public interest is demonstrably on the side of encouraging less "vigor" and more "caution" on the part of decisionmakers. That is, the very steps that Congress has taken to assure that executive employees will be able freely to testify in Congress and to assure that they will not be subject to arbitrary adverse actions indicate that those policy arguments that have elsewhere justified absolute immunity are not applicable here. Absolute immunity would be nothing more than a judicial declaration of policy that directly contradicts the policy of protecting civil servants reflected in the statutes and regulations.

If respondent could, in fact, have proceeded on his two statutory claims, the *Bivens* action would be superfluous. Respondent may not collect damages twice, and the same injuries are put forward by respondent as the basis for both the statutory and constitutional claims. As we have said before, "were Congress to create equally effective alternative

remedies, the need for damages relief [directly under the Constitution] might be obviated." *Davis* v. *Passman*, 442 U. S. 228, 248 (1979). Nevertheless, because the majority decides that the President is absolutely immune from a *Bivens* action as well, I shall express my disagreement with that conclusion.

In *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), we held that individuals who have suffered a compensable injury through a violation of the rights guaranteed them by the Fourth Amendment may invoke the general federal-question jurisdiction of the federal courts in a suit for damages. That conclusion rested on two principles: First, " '[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws,' " *id.*, at 397, quoting *Marbury* v. *Madison*, 1 Cranch, at 163; second, "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." 403 U. S., at 395. In *Butz* v. *Economou*, 438 U. S. 478 (1978), we rejected the argument of the Federal Government that federal officers, including Cabinet officers, are absolutely immune from civil liability for such constitutional violations—a position that we recognized would substantially undercut our conclusion in *Bivens*. We held there that although the performance of certain limited functions will be protected by the shield of absolute immunity, the general rule is that federal officers, like state officers, have only a qualified immunity. Finally, in *Davis* v. *Passman, supra*, we held that a Congressman could be held liable for damages in a *Bivens*-type suit brought in federal court alleging a violation of individual rights guaranteed the plaintiff by the Due Process Clause. In my view, these cases have largely settled the issues raised by the *Bivens* problem here.

These cases established the following principles. First, it is not the exclusive prerogative of the Legislative Branch to create a federal cause of action for a constitutional violation. In the absence of adequate legislatively prescribed remedies, the general federal-question jurisdiction of the federal

courts permits the courts to create remedies, both legal and equitable, appropriate to the character of the injury. Second, exercise of this "judicial" function does not create a separation-of-powers problem: We have held both executive and legislative officers subject to this judicially created cause of action and in each instance we have rejected separation-of-powers arguments. Holding federal officers liable for damages for constitutional injuries no more violates separation-of-powers principles than does imposing equitable remedies under the traditional function of judicial review. Third, federal officials will generally have a "qualified immunity" from such suits; absolute immunity will be extended to certain functions only on the basis of a showing that exposure to liability is inconsistent with the proper performance of the official's duties and responsibilities. Finally, Congress retains the power to restrict exposure to liability, and the policy judgments implicit in this decision should properly be made by Congress.

The majority fails to recognize the force of what the Court has already done in this area. Under the above principles, the President could not claim that there are no circumstances under which he would be subject to a *Bivens*-type action for violating respondent's constitutional rights. Rather, he must assert that the absence of absolute immunity will substantially impair his ability to carry out particular functions that are his constitutional responsibility. For the reasons I have presented above, I do not believe that this argument can be successfully made under the circumstances of this case.

It is, of course, theoretically possible that the President should be held to be absolutely immune because each of the functions for which he has constitutional responsibility would be substantially impaired by the possibility of civil liability. I do not think this argument is valid for the simple reason that the function involved here does not have this character.

On which side of the line other Presidential functions would fall need not be decided in this case.

The majority opinion suggests a variant of this argument. It argues, not that every Presidential function has this character, but that distinguishing the particular functions involved in any given case would be "difficult." *Ante*, at 756.[34] Even if this were true, it would not necessarily follow that the President is entitled to absolute immunity: That would still depend on whether, in those unclear instances, it is likely to be the case that one of the functions implicated deserves the protection of absolute immunity. In this particular case, I see no such function.[35]

I do not believe that subjecting the President to a *Bivens* action would create separation-of-powers problems or "public policy" problems different from those involved in subjecting the President to a statutory cause of action.[36] Relying upon

---

[34] The majority also seems to believe that by "function" the Court has in the past referred to "subjective purpose." See *ante*, at 756 ("an inquiry into the President's motives could not be avoided under the . . . 'functional' theory . . ."). I do not read our cases that way. In *Stump* v. *Sparkman*, 435 U. S. 349, 362 (1978), we held that the factors determining whether a judge's act was a "judicial action" entitled to absolute immunity "relate to the nature of the act itself, *i. e.*, whether it is a function normally performed by a judge, and to the expectations of the parties." Neither of these factors required any analysis of the purpose the judge may have had in carrying out the particular action. Similarly in *Butz* v. *Economou*, 438 U. S., at 512–516, when we determined that certain executive functions were entitled to absolute immunity because they shared "enough of the characteristics of the judicial process," we looked to objective qualities and not subjective purpose.

[35] The majority seems to suggest that responsibility for governmental reorganizations is one such function. *Ante*, at 756. I fail to see why this should be so.

[36] Although our conclusions differ, the majority opinion reflects a similar view as to the relationship between the two sources of the causes of action in this case: It does not believe it necessary to differentiate in its own analysis between the statutory and constitutional causes of action.

the history and text of the Constitution, as well as the analytic method of our prior cases, I conclude that these problems are not sufficient to justify absolute immunity for the President in general, nor under the circumstances of this case in particular.

## III

Because of the importance of this case, it is appropriate to examine the reasoning of the majority opinion.

The opinion suffers from serious ambiguity even with respect to the most fundamental point: How broad is the immunity granted the President? The opinion suggests that its scope is limited by the fact that under none of the asserted causes of action "has Congress taken express legislative action to subject the President to civil liability for his official acts." *Ante*, at 748. We are never told, however, how or why congressional action could make a difference. It is not apparent that any of the propositions relied upon by the majority to immunize the President would not apply equally to such a statutory cause of action; nor does the majority indicate what new principles would operate to undercut those propositions.

In the end, the majority seems to overcome its initial hesitation, for it announces that "[w]e consider [absolute] immunity a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history," *ante*, at 749. See also *ante*, at 757 ("A rule of absolute immunity for the President will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive").[37] While the majority opinion recognizes that "[i]t is

---

[37] THE CHIEF JUSTICE leaves no doubt that he, at least, reads the majority opinion as standing for the broad proposition that the President is absolutely immune under the Constitution:

"I write separately to underscore that the Presidential immunity [as spelled out today] derives from and is mandated by the constitutional doctrine of separation of powers." Concurring opinion of THE CHIEF JUSTICE, *ante*, at 758.

settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States," it bases its conclusion, at least in part, on a suggestion that there is a special jurisprudence of the Presidency. *Ante*, at 753–754.[38]

But in *United States* v. *Nixon*, 418 U. S. 683 (1974), we upheld the power of a Federal District Court to issue a subpoena *duces tecum* against the President. In other cases we have enjoined executive officials from carrying out Presidential directives. See, *e. g.*, *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952). Not until this case has there ever been a suggestion that the mere formalism of the name appearing on the complaint was more important in resolving separation-of-powers problems than the substantive character of the judicial intrusion upon executive functions.

---

Similarly, THE CHIEF JUSTICE dismisses the majority's claim that it has not decided the question of whether Congress could create a damages action against the President: "[T]he Court's holding . . . effectively resolves that issue; once it is established that the Constitution confers absolute immunity, as the Court holds today, legislative action cannot alter that result." *Ante*, at 763, n. 7.

[38] Contrary to the suggestion of the majority, *Mississippi* v. *Johnson*, 4 Wall. 475 (1866), carefully reserved the question of whether a court may compel the President himself to perform ministerial executive functions:

"We shall limit our inquiry to the question presented by the objection, without expressing any opinion on the broader issues . . . whether, in any case, the President . . . may be required, by the process of this court, to perform a purely ministerial act under a positive law, or may be held amenable, in any case, otherwise than by impeachment for crime." *Id.*, at 498.

Similarly, *Kendall* v. *United States*, 12 Pet. 524 (1838), also cited by the majority, did not indicate that the President could never be subject to judicial process. In fact, it implied just the contrary in rejecting the argument that the mandamus sought involved an unconstitutional judicial infringement upon the Executive Branch:

"The mandamus does not seek to direct or control the postmaster general in the discharge of any official duty, partaking in any respect of an executive character; but to enforce the performance of a mere ministerial act, which neither he nor the President had any authority to deny or control." *Id.*, at 610.

The majority suggests that the separation-of-powers doctrine permits exercising jurisdiction over the President only in those instances where "judicial action is needed to serve broad public interests—as when the Court acts, not in derogation of the separation of powers, but to maintain their proper balance." *Ante*, at 754. Without explanation, the majority contends that a "merely private suit for damages" does not serve this function. *Ibid.*

The suggestion that enforcement of the rule of law—*i. e.*, subjecting the President to rules of general applicability—does not further the separation of powers, but rather is in derogation of this purpose, is bizarre. At stake in a suit of this sort, to the extent that it is based upon a statutorily created cause of action, is the ability of Congress to assert legal restraints upon the Executive and of the courts to perform their function of providing redress for legal harm. Regardless of what the Court might think of the merits of Mr. Fitzgerald's claim, the idea that pursuit of legal redress offends the doctrine of separation of powers is a frivolous contention passing as legal argument.

Similarly, the majority implies that the assertion of a constitutional cause of action—the whole point of which is to assure that an officer does not transgress the constitutional limits on his authority—may offend separation-of-powers concerns. This is surely a perverse approach to the Constitution: Whatever the arguments in favor of absolute immunity may be, it is untenable to argue that subjecting the President to constitutional restrictions will undercut his "unique" role in our system of government. It cannot be seriously argued that the President must be placed beyond the law and beyond judicial enforcement of constitutional restraints upon executive officers in order to implement the principle of separation of powers.

Focusing on the actual arguments the majority offers for its holding of absolute immunity for the President, one finds surprisingly little. As I read the relevant section of the

Court's opinion, I find just three contentions from which the majority draws this conclusion. Each of them is little more than a makeweight; together they hardly suffice to justify the wholesale disregard of our traditional approach to immunity questions.

First, the majority informs us that the President occupies a "unique position in the constitutional scheme," including responsibilities for the administration of justice, foreign affairs, and management of the Executive Branch. *Ante*, at 749–750. True as this may be, it says nothing about why a "unique" rule of immunity should apply to the President. The President's unique role may indeed encompass functions for which he is entitled to a claim of absolute immunity. It does not follow from that, however, that he is entitled to absolute immunity either in general or in this case in particular.

For some reason, the majority believes that this uniqueness of the President shifts the burden to respondent to prove that a rule of absolute immunity does not apply. The respondent has failed in this effort, the Court suggests, because the President's uniqueness makes "inapposite" any analogy to our cases dealing with other executive officers. *Ante*, at 750. Even if this were true, it would not follow that the President is entitled to absolute immunity; it would only mean that a particular argument is out of place. But the fact is that it is not true. There is nothing in the President's unique role that makes the arguments used in those other cases inappropriate.

Second, the majority contends that because the President's "visibility" makes him particularly vulnerable to suits for civil damages, *ante*, at 753, a rule of absolute immunity is required. The force of this argument is surely undercut by the majority's admission that "there is no historical record of numerous suits against the President." *Ante*, at 753, n. 33. Even granting that a *Bivens* cause of action did not become available until 1971, in the 11 years since then there have

been only a handful of suits. Many of these are frivolous and dealt with in a routine manner by the courts and the Justice Department. There is no reason to think that, in the future, the protection afforded by summary judgment procedures would not be adequate to protect the President, as they currently protect other executive officers from unfounded litigation. Indeed, given the decision today in *Harlow* v. *Fitzgerald, post,* p. 800, there is even more reason to believe that frivolous claims will not intrude upon the President's time. Even if judicial procedures were found not to be sufficient, Congress remains free to address this problem if and when it develops.

Finally, the Court suggests that potential liability "frequently could distract a President from his public duties." *Ante,* at 753. Unless one assumes that the President himself makes the countless high-level executive decisions required in the administration of government, this rule will not do much to insulate such decisions from the threat of liability. The logic of the proposition cannot be limited to the President; its extension, however, has been uniformly rejected by this Court. See *Butz* v. *Economou,* 438 U. S. 478 (1978); *Harlow* v. *Fitzgerald, post,* p. 800. Furthermore, in no instance have we previously held legal accountability in itself to be an unjustifiable cost. The availability of the courts to vindicate constitutional and statutory wrongs has been perceived and protected as one of the virtues of our system of delegated and limited powers. As I argued in Part I, our concern in fashioning absolute immunity rules has been that liability may pervert the decisionmaking process in a particular function by undercutting the values we expect to guide those decisions. Except for the empty generality that the President should have "'the maximum ability to deal fearlessly and impartially with' the duties of his office," *ante,* at 752, the majority nowhere suggests a particular, disadvantageous effect on a specific Presidential function. The caution that comes from requiring reasonable choices in areas that

may intrude on individuals' legally protected rights has never before been counted as a cost.

## IV

The majority may be correct in its conclusion that "[a] rule of absolute immunity . . . will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive." *Ante*, at 757. Such a rule will, however, leave Mr. Fitzgerald without an adequate remedy for the harms that he may have suffered. More importantly, it will leave future plaintiffs without a remedy, regardless of the substantiality of their claims. The remedies in which the Court finds comfort were never designed to afford relief for individual harms. Rather, they were designed as political safety valves. Politics and history, however, are not the domain of the courts; the courts exist to assure each individual that he, as an individual, has enforceable rights that he may pursue to achieve a peaceful redress of his legitimate grievances.

I find it ironic, as well as tragic, that the Court would so casually discard its own role of assuring "the right of every individual to claim the protection of the laws," *Marbury* v. *Madison*, 1 Cranch, at 163, in the name of protecting the principle of separation of powers. Accordingly, I dissent.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

I join JUSTICE WHITE's dissent. For me, the Court leaves unanswered his unanswerable argument that no man, not even the President of the United States, is absolutely and fully above the law. See *United States* v. *Lee*, 106 U. S. 196, 220 (1882),[1] and *Marbury* v. *Madison*, 1 Cranch 137, 163

---

[1] "No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it."

(1803).[2]  Until today, I had thought this principle was the foundation of our national jurisprudence.  It now appears that it is not.

Nor can I understand the Court's holding that the absolute immunity of the President is compelled by separation-of-powers concerns, when the Court at the same time expressly leaves open, *ante*, at 748, and n. 27, the possibility that the President nevertheless may be fully subject to congressionally created forms of liability.  These two concepts, it seems to me, cannot coexist.

I also write separately to express my unalleviated concern about the parties' settlement agreement, the key details of which were not disclosed to the Court by counsel until the veritable "last minute," and even then, only because the Halperins' motion to intervene had directed the Court's attention to them.  See *ante*, at 743–744, n. 24.  The Court makes only passing mention of this agreement in Part II–B of its opinion.

For me, the case in effect was settled before argument by petitioner's payment of $142,000 to respondent.  A much smaller sum of $28,000 was left riding on an outcome favorable to respondent, with nothing at all to be paid if petitioner prevailed, as indeed he now does.  The parties publicly stated that the amount of any payment would depend upon subsequent proceedings in the District Court; in fact, the parties essentially had agreed that, regardless of this Court's ruling, no further proceedings of substance would occur in the District Court.  Surely, had the details of this agreement been known at the time the petition for certiorari came before the Court, certiorari would have been denied.  I cannot escape the feeling that this long-undisclosed agreement

---

[2] "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.  One of the first duties of government is to afford that protection.  In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court."

comes close to being a wager on the outcome of the case, with all of the implications that entails.

*Havens Realty Corp.* v. *Coleman,* 455 U. S. 363 (1982), most recently—and, it now appears, most conveniently— decided, affords less than comfortable support for retaining the case.[3] The pertinent question here is not whether the case is moot, but whether this is the *kind* of case or controversy over which we should exercise our power of discretionary review. Cf. *United States* v. *Johnson,* 319 U. S. 302 (1943).

Apprised of all developments, I therefore would have dismissed the writ as having been improvidently granted. The Court, it seems to me, brushes by this factor in order to resolve an issue of profound consequence that otherwise would not be here. Lacking support for such a dismissal, however, I join the dissent.

---

[3] The agreement in *Havens* was not final until approved by the District Court, 455 U. S., at 370–371. In the present case, the parties made their agreement and presented it to the District Court only after the fact. Further, there was no preliminary payment in *Havens.* Each respondent there was to receive $400 if the Court denied certiorari or affirmed, and nothing if the Court reversed. Here, $142,000 changed hands regardless of the subsequent disposition of the case, with the much smaller sum of $28,000 resting on the Court's ultimate ruling. For me, this is not the kind of case or controversy contemplated by Art. III of the Constitution.