BEAM, Circuit Judge,
concurring specially.
I concur in the conclusions reached by Judge Bowman. I write separately to express my views on three matters which are, in my mind, insufficiently discussed by either. the opinion of the court or the dissent.
I.
Mr. Clinton and his amicus vigorously present their position on the potential impact of this civil litigation on the office and the duties of the presidency. And, without question, they raise matters of substantial concern given the constitutional obligations of the office. What is missing from their arguments is a coordinated and balanced analysis of the impact a stay of the litigation, including an embargo on all discovery, will have on Ms. Jones and her claims. This should also be of substantial concern because it involves fundamental constitutional rights governing access to and use of the judicial process under the First and Fourteenth Amendments and the right to a timely jury trial under the Seventh Amendment, to identify only a few specific omissions.
It is incorrect, in my view, for Mr. Clinton and his amicus to assert that the delay is of no consequence to Ms. Jones. Aside from the adage that justice delayed is justice denied, Ms. Jones faces real dangers of loss of evidence through the unforeseeable calamities inevitable with the passage of time. To argue that this problem may be dealt with by episodic exceptions when the risk of loss is apparent is to miss the point. Only rarely does life proceed in such a foreseeable fashion.
The dissent states, “[wjhere there is no urgency to pursue a suit for civil damages, the proper course is to avoid opportunities for breaching separation of powers altogether by holding the litigation in abeyance until a President leaves office.” Infra at 1369. The dissent urges total abeyance of both discovery and trial. I perceive this, perhaps incorrectly, to be an implicit finding that there is, indeed, no real urgency to Ms. Jones’s suit for civil damages and, thus, the constitutionally based separation of powers doctrine demands that this litigation, in all of its manifestations, be abated until Mr. Clinton leaves office — this to protect the constitutional grant of executive authority given to a sitting President. In my view, this greatly oversimplifies the issues in this appeal and overstates the danger to the presidency. The potential for prejudice to Ms. Jones, as earlier noted, reaches, or at least approaches, constitutional magnitude. If a blanket stay is granted and discovery is precluded as suggested by Mr. Clinton and his amicus, Ms. Jones will have no way that I know of (and none has been advanced by those counseling *1364 this course of action),[1] to perpetuate the testimony of any party or witness should they die or become incompetent during the period the matter is held in abeyance. Should the death or incompetence of a key witness occur, proving the elements of Ms. Jones’s alleged causes of action will become impossible. Thus, her “chose in action” would be obliterated, or at least substantially damaged if she is denied reasonable and timely access to the workings of the federal tribunal.
It is true that some of Ms. Jones’s claims would survive to her guardian, heirs or assigns in the event of her incompetence or death, assuming a way is found to preserve crucial evidence. Her claim of defamation is in a different class. It almost certainly would be totally extinguished should either party die. This would also include her defamation claims asserted against Trooper Ferguson.
From the pleadings, the forum law applicable to her defamation claims is not easily discernible and I have not canvassed the law in every conceivable jurisdiction. It seems appropriate to note, however, that under Arkansas law, for example, the defamation claims would expire on the death of either party. See Ark.Code Ann. § 16—62—101(b) (Michie 1987 & Supp.1993); Parkerson v. Carrouth, 782 F.2d 1449, 1451-53 (8th Cir.1986). I think Arkansas expresses the rule of most jurisdictions. Accordingly, one can readily see the irreparable harm that a stay of this claim (assuming its viability as we must at this point) will bring to Ms. Jones. Thus, the total stay requested by Mr. Clinton and his amicus, and embraced by the dissent, will immediately produce a threat of irreparable injury.
Even though a sitting President is not immune from liability for his nonofficial conduct, it is fair to note that some of Ms. Jones’s defamation claims, as presently alleged, may well fit within the “outer perimeter” of official responsibility as discussed in Nixon v. Fitzgerald, 457 U.S. 731, 756, 102 S.Ct. 2690, 2704, 73 L.Ed.2d 349 (1982). Thus, at the very least, absolute immunity defenses to these claims should be immediately taken up and decided by the district court.
The dissent appears to recognize the potential for irreparable harm to Ms. Jones and proposes that her interests — as balanced against the interests of Mr. Clinton — be analyzed and weighed by shifting the burden of establishing “irreparable injury” to Ms. Jones, along with the additional burden on Ms. Jones of showing “that the immediate adjudication of the suit will not significantly impair the President’s ability to attend to the duties of his office.” Infra at 1369. The dissent cites no established authority or case precedent for this burden-shifting strategy, even by analogy to some reasonably comparable situation. I have discovered none. In this regard, there is no way, in my view, that a litigant could ever successfully shoulder the burden assigned by the dissent, especially if all discovery is prohibited. To determine, as a precondition to “immediate adjudication,” that at some future time the lawsuit will not significantly impair the duties of the President would be an impossible task. Thus, the dissent’s proposed safety valve is valueless, except in its recognition of the potential for irreparable harm to Ms. Jones caused by the total stay.
Notwithstanding the separation of powers concerns outlined by the dissent, the burden, in my view, should be shouldered, as in any other civil litigation, by the party seeking to delay the usual course of discovery and trial. Otherwise, we will have established requirements of insurmountable proportions for any litigant who may have a viable and urgent civil claim against a sitting President or perhaps, against other important governmental figures with constitutionally established duties.
This approach to staying litigation is a well-established legal concept. Traditionally, an applicant for a stay has the burden of showing specific hardship or inequity if he or she is required to go forward. Landis v. North American Co., 299 U.S. 248, 254-56, 57 S.Ct. 163, 165-67, 81 L.Ed. 153 (1936). *1365 This may be a sub silentio recognition of the terms of the Seventh Amendment. However, great public interest may authorize a stay which is not immoderate or oppressive in its consequences. Id. at 256, 57 S.Ct. at 166-67. Thus, while there is a balancing to be done, the presumption is on Ms. Jones’s, not Mr. Clinton’s, side. "When stays are granted, after the petitioner for the stay meets his “heav[ ]y” burden of showing “the justice and wisdom of a departure from the beaten track,” they must be narrowly tailored or they will amount to an abuse of discretion. Id. Of course, the justice and wisdom of such a departure will take into account, in this case, that one of the parties is the sitting President of the United States. See generally United States v. Poindexter, 732 F.Supp. 142, 146 (D.D.C.1990). Nonetheless, I agree with Judge Bowman that Mr. Clinton should carry this initial burden, not Ms. Jones.
In determining whether to stay the litigation, Ms. Jones must be given the benefit of the concept that “[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever [s]he receives an injury.” Marburg v. Madison, 5 U.S. (1 Cranch) 137, 161, 2 L.Ed. 60 (1803) (emphasis added). More recently, and explicitly, access to the courts has been held to be a “fundamental constitutional right” founded in the Due Process and Equal Protection clauses. See Bounds v. Smith, 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977). This right is pivotal to our system of governance in that “civil rights actions [such as the 42 U.S.C. § 1983 action at issue here] are of ‘fundamental importance ... in our constitutional scheme’ because they directly protect our most valued rights.” Id. at 827, 97 S.Ct. at 1498 (quoting Johnson v. Avery, 393 U.S. 483, 485, 89 S.Ct. 747, 748-49, 21 L.Ed.2d 718 (1969)).
Surely, if civil rights actions are of such importance that they may not be impeded or delayed by a person’s incarceration, there must be at least an equal public interest in an ordinary citizen’s timely vindication of his or her most fundamental right against alleged abuse of power by governmental officials. As noted, Ms. Jones has, in part, brought a 42 U.S.C. § 1983 action, not a mere run-of-the-mill tort claim. The violation of civil rights through the abuse of state government positions of power has been of such great public concern that Congress felt it necessary to enact section 1983 to protect the citizenry and to hold persons with positions of power accountable for its abuse. Thus, this is not a minor civil dispute to which one can assign no public interest beside that on the side of the presidency. The balance to be considered, therefore, is not completely one sided. There is a public interest, as well as an individual interest, on Ms. Jones’s side of the scale. These interests are of such weight that, at least provisionally, Ms. Jones is entitled to proceed.
II.
I now turn to the potential impact upon the duties of the presidency. The dissent eloquently and properly raises several unanswered questions, infra at 1368-69, concerning judicial branch interference with the functioning of the presidency should this suit be allowed to go forward. Again, I readily admit that these are matters of major concern. In my view, however, these concerns for interbranch interference are greatly overstated by Mr. Clinton and his amicus. Indeed, they are not appreciably greater than those faced in many other instances in which a sitting President interfaces as a party, witness, or target with the judicial and legislative branches of the government. Judge Bowman notes at least three earlier instances in which sitting Presidents have been involved in civil litigation outside of official presidential duties. Supra at 1361 & n. 10. Also in the past, under appropriate circumstances “several American Presidents and former Presidents have given testimony under oath in judicial or quasi-judicial settings.” 1 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law § 7.1 at 572 (2d ed. 1992). Former and sitting Presidents have previously submitted, either voluntarily or involuntarily, to questions under oath. Id. By doing so, they implicitly submitted to the common law rule, expressed by Lord Hard-wicke, “that the public has a right to every man’s evidence” 8 John H. Wigmore, Evidence § 2192, at 71 (John McNaughton ed. *1366 rev. 1961) (quoting 12 Cobbett’s Parliamentary History 675, 693 (1942)).
Is there any reason why this right should suffer an exception when the desired knowledge is in the possession of a person occupying at the moment the' office of chief executive of a state?
There is no reason at all. His temporary duties as an official cannot override his permanent and fundamental duty as a citizen and as a debtor to justice.
Id. at § 2370(c) (emphasis in original).
As a sitting President, Richard Nixon was a defendant in at least two civil actions. In one, Mr. Nixon was ordered by the Supreme Court to produce tapes subpoenaed by a special prosecutor. United States v. Nixon, 418 U.S. 683, 713, 94 S.Ct. 3090, 3110, 41 L.Ed.2d 1039 (1974). In the other, National Treasury Employees Union v. Nixon, 492 F.2d 587 (D.C.Cir.1974) the court held that a President is amenable to legal process, even in his official capacity, if absolutely necessary. Mr. Nixon did not appeal that determination.
Also, as noted by Rotunda and Nowak, President Jimmy Carter gave videotaped testimony during his presidency that was presented at the criminal conspiracy trial of two Georgia state officials. See 1 Rotunda & Nowak § 7.1 at 575. Later, then-sitting President Carter provided videotaped testimony for a grand jury investigating charges that Robert Vesco had enlisted White House aid to quash extradition proceedings against him. Id. Finally, still-sitting President Carter was interviewed under oath by Justice Department investigators probing “for criminal, civil, and administrative purposes” any offenses resulting from Billy Carter’s relations with the Libyan Government. Id. Further, President Gerald Ford was compelled to testify by videotape deposition in the criminal trial of Lynette (Squeaky) Fromme, who was charged with attempting to assassinate the President. Id. 'at 581. There are numerous other instances in which a sitting President has both voluntarily or involuntarily appeared at judicial proceedings and before committees of Congress. Such instances have involved, at least, Presidents Thomas Jefferson, James Monroe, Abraham Lincoln and Ulysses S. Grant. See id. § 7.1.
I concede that most of these situations have arisen within the framework of governmental operations. I further concede that there is not a perfect fit between the interests at play in the cited interbranch proceedings and the civil litigation at issue here. My point is that each named President has obviously scheduled these encounters without creating a cataclysmic episode in which the constitutional duties of the office have been compromised.
Ms. Jones’s complaint presents relatively uncomplicated civil litigation, the discovery for which can and should be carried out with a minimum of impact on the President’s schedule. It is doubtful, for instance, that more than one, perhaps two, face-to-face pretrial encounters between the President and Ms. Jones’s representatives need to occur. Indeed, there is not even a requirement that parties be present at the trial of civil litigation and with some frequency they are not. At the bottom line, the availability of written interrogatories, written requests for admissions and written stipulations of undisputed facts, as allowed by the Federal Rules of Civil Procedure, would indicate that the actual impact of this litigation on the duties of the presidency, if that is Mr. Clinton’s real concern, is being vastly magnified, especially assuming the trial judge’s careful supervision of the litigation with maximum consideration of the President’s constitutional duties.
III.
My final concern involves Trooper Danny Ferguson. Even assuming, for sake of argument, the validity of every constitutional claim or defense advanced by Mr. Clinton, I can find no basis for staying discovery or trial of the claims against Trooper Ferguson. Whether private citizen or President, it is unlikely that Mr. Clinton would choose to be present at the deposition of Trooper Ferguson or any sundry witness; certainly he would not be required to attend and no prejudice is likely to result from his absence. Neither would he need to be directly concerned with other discovery directed to Trooper Ferguson although it might, admit *1367 tedly, affect his interests. Even so, I find no separation of powers or other constitutional basis for a stay for this portion of the litigation, especially the discovery process.[2]
IV.
I in no way seek to downplay the concerns outlined by the dissent. At the same time, I feel that Judge Bowman’s opinion reasonably charts a fair course through the competing constitutional waters and does so without serious injury to the rights of any party. As I have attempted to stress, nothing prohibits the trial judge from halting or delaying or rescheduling any proposed action by any party at any time should she find that the duties of the presidency are even slightly imperiled. With this understanding, I concur.

. Only the amicus brief filed by the Solicitor General fleetingly mentions this problem, but it offers no solutions.

. Any problems that arise from attempts by Trooper Ferguson to depose or otherwise conduct discovery from Mr. Clinton, if resisted, are, ín my view, separate from the issues raised in this appeal.